**STATE of Missouri, Respondent,**

v.

**Roy Gene WHITE, Appellant.**

**Roy Gene WHITE, Appellant,**

v.

**STATE of Missouri, Respondent.**

**No. 53624.**

Missouri Court of Appeals,
Eastern District,
Division Four.

April 10, 1990.

Applications to Transfer
Denied July 31, 1990.

Susan L. Hogan, Columbia, for appellant.

William L. Webster, Atty. Gen., Elisabeth L. Ziegler, Asst. Atty. Gen., Jefferson City, for respondent.

HAMILTON, Presiding Judge.

On June 27, 1987, a jury convicted Appellant Roy White (hereinafter White) of murder first degree, Section 565.020.1 RSMo 1986. The trial court thereafter sentenced him to life imprisonment without eligibility for probation or parole. On June 28, 1988, White filed a *pro se* motion for post-conviction relief pursuant to Rule 29.15. The motion court appointed counsel on July 1, 1988. On May 11, 1989, it filed findings of fact and conclusions of law denying White's motion without an evidentiary hearing. White now appeals both his conviction and the denial of his Rule 29.15 motion without an evidentiary hearing. We affirm.

In late 1985, White approached James Colvin (hereinafter Colvin) about an investment opportunity organized by Vietnam war veterans that required a minimum $1000 investment and, after ninety days, guaranteed interest of ten to fifteen percent, payable quarterly, or a loan. White explained that an attorney from West Plains named "Jim" would manage the money. Colvin made five or six contributions, investing a total of $5600, and arranged for friends, Stan and Donna Curtis, to invest $5000. The ninety-day period for return on the investment ended March 15, 1986.

The Colvins attempted to obtain an early return of their investment, but White told them he was unable to contact Jim. White continued to report that he was unable to contact Jim even after the March 15 due date passed. The Colvins threatened to turn the matter over to the Missouri Attorney General's office. After failing to appear for a scheduled meeting in Rolla on

April 22, 1986, White agreed to meet the Colvins on Thursday, April 24, at the radio station in Houston, Missouri, where White was scheduled to appear on a promotional program.

White purchased a Honda motorcycle in August, 1984. His original check for $7800 toward the purchase of the motorcycle failed to clear. The dealer agreed to finance the sale, but White failed to make monthly payments. He made two cash payments of $2000 each in April, 1985 and September, 1985. In July or August, 1985, White asked Jim Byler, the president of Farmers Bank of Raymondville, about obtaining a loan for the motorcycle, but the bank was making no loans on motorcycles at this time. The dealer repossessed the motorcycle in January, 1986. In late March, the dealer filed for repossession of the title. White was scheduled to participate on Saturday, April 26, 1986, in an automobile and motorcycle show. White was a member of the automobile club sponsoring the show.

Although he owed money to the Colvins and other investors and his motorcycle had been repossessed, White visited another motorcycle dealer in Waynesville, Missouri, on April 22 or 23, stating that he was considering trading his motorcycle for a new one. He also attended an automobile club meeting and announced an anonymous donation of $800 for a raffle to be held April 26.

In March or early April, 1986, White had purchased a .22 caliber revolver, holster and shell belt, and a .32 caliber pistol and holster. He also assured the Colvins he would get their money when they threatened to contact the Attorney General's office. During this same period, he regularly called the Honda dealer to tell him he would have the money. In the ten days preceding April 25, White called the dealer ten to twelve times stating he would be getting the money from an Agent Orange settlement.

White knew both Jim and Wanda Byler through dealings at the bank and the area Chamber of Commerce. In the past, White had attempted to sell the Bylers life insur-ance and had sold them boat insurance. White had visited the Byler home.

At approximately 9:15 a.m. on April 22, White turned his yellow Volkswagen around in a driveway where the road dead-ends about 1½ miles from the Byler home. Wanda Byler was at work that morning. This was the same morning White failed to meet Colvin in Rolla.

On April 24, 1986, Jim Byler awoke at approximately 6 a.m. and left his house about 7 a.m. to meet friends for breakfast at a Houston restaurant before work. Wanda Byler had the day off from work and was still sleeping when Byler left home to drive to Houston. Byler arrived at the restaurant at 7:15. He left the restaurant at approximately 8 a.m., travelling approximately one block to the bank. Realizing that he left his hat at the restaurant, he went back for it. At 8:15, while Byler was gone, a man called the bank identifying himself as Jay Lewis and asking for Byler. Byler returned to the bank shortly before 8:30.

The man called again at 8:30. This time he spoke to Byler. Again he identified himself as Jay Lewis and in a rough voice stated, "We have your wife...." He instructed Byler to leave the Houston bank within five seconds, go to the Raymondville branch, pick up $100,000, and deliver it to the Byler residence by setting it down in the garage and leaving. He further warned that the bank in Houston was being watched and that Byler would be notified about where he could pick up his wife. The caller allowed Wanda Byler to speak briefly to her husband.

Byler told other bank employees about the call and emptied a brown briefcase. Kay Jordan (hereinafter Jordan), vice president of the bank, told Byler she would accompany him. At 8:35 they drove to the branch bank in Raymondville where employees put $22,900 in the briefcase. This cash included three packets of ten dollar bills from the bank's "bait money." The serial numbers of the thirty ten dollar bills were on record and kept by the bank. Three thousand dollars in one dollar bills were included. Byler called the sheriff's

office from the bank and asked the deputy to allow time for the money drop. Then he and Jordan drove to Byler's house in Byler's Chevrolet Blazer.

Byler drove up to the garage doors at the back of the house. He stopped the Blazer ten to fifteen feet from the open door of the garage and took the briefcase of money to the open door. He set the briefcase down and started to walk back to the door, when a gruff voice said, "Hold it right there." White stepped out from the garage, holding Byler's gun, which was normally kept in a box in the nightstand of Byler's bedroom.

Kay Jordan remained in the Blazer, watching through the front windshield. She could see halfway into the garage. The day was bright, and she could see clearly. She watched White for four to five minutes and described him as a 5 feet 10 inch tall man with dark hair, wearing a camouflage cap and camouflage clothing with blacking on his face.

White seemed uncertain about what he wanted done. Finally, he ordered Kay Jordan out of the Blazer. She walked to within three or four feet of White and then lay down in the small space between the Byler's car and the closed garage door after White ordered both Byler and Jordan to lie face down. Jordan had known Roy White for about thirteen years. She thought at the time the man was Roy White and identified him by name to her husband later that day.

White closed the garage door. When Jordan turned her head to look at him again, he ordered her not to look at him and to put her head down. Almost immediately afterwards, he shot Byler in the head. Then he shot Jordan in the head. When she pleaded for her life, he beat her with the gun, breaking the gun's handle. White drove the Blazer away from the scene.

Byler helped Jordan up and attempted to telephone for help, but the phone had been left off the receiver in another room. He returned to the car where he discovered the broken gun lying on the back of the car. Tossing it into the car, he drove Kay Jordan and himself to Raymondville to seek help.

Police discovered Wanda Byler's body in the bedroom of the Byler residence at 10:05 a.m. The body was covered with a quilt and a towel was wrapped around the head secured by a piece of red rope. A cotton cord was wrapped around her right wrist and ligature marks were apparent on both wrists. Wanda Byler had been shot eleven times, eight times in the center and left of her chest. The chest and abdominal wounds were the cause of death. Five of the chest wounds were caused by a .22 caliber weapon and three by a .38 caliber weapon. At least four different guns were used. Only one of the bullets recovered came from Byler's .38 caliber handgun.

White was due at the radio station on Highway B to participate in a 9:30 a.m. promotional program about the automobile show scheduled for the weekend. He called at approximately 8:40 to say he would be late. Deputies driving east on Highway B toward the Byler residence passed White in his yellow Volkswagen. White arrived at the radio station between 9:15 and 9:20 wearing a camouflage uniform and heavy boots. He had blacking on his face that he washed off before the show. He also removed the camouflage outer clothing. Although he appeared flushed and in a hurry, White proceeded with the show. When the program was interrupted with a news bulletin about the incident, he appeared shocked and then continued the program.

Following the radio program, White paid in cash a $75 advertising bill at the radio station. Included in that payment was a ten dollar bill from the bait money.

The Colvins met White at the radio station as planned. They noticed a black substance around White's hairline. They agreed to meet him at his house. He had a brown briefcase which he took into the bedroom while they waited in the living room. White returned with a sack full of cash. The sack contained $10,600 for the Colvins and their friends who had invested. One thousand nine hundred seventy-six one dollar bills were included in the payment.

On April 25, White went to Cycle Center to pay the balance due on his repossessed motorcycle. Saying he had borrowed the

money, he paid the balance of $6,158.28 in cash that he carried in six bundles in a brown paper bag. White asked the Cycle Center clerks to spread or "dribble" the deposits to avoid suspicion in view of the Byler murder. Two of the ten dollar bills from the bait money were included in the payment for the motorcycle.

Highway Patrol officers spoke to White twice on April 25, 1986. He first told them that he left home about 5:30 a.m. on April 24 to go to Cedar Grove to fish and listen for turkeys. He said he wore a camouflage jacket and pants over blue jeans and a plaid shirt and smooth-soled boots. He wore camouflage paint on his face. He said he left about 8:30 to drive to the radio station, taking a shortcut through Raymondville so that he arrived at the radio station just before 9 a.m.

During a second interview later that day, officers advised White of his *Miranda* warnings and requested permission to search his residence. He consented and directed them to the weapons in the house. None of the weapons in White's residence were used in the shooting. His camouflage clothing felt damp; his jungle boots were very clean. In his backpack, officers found a pair of thick black gloves. His wallet contained $131, including three bills from the bait list. They also found the handle and hardware from a briefcase in White's trash-burning barrel.

After speaking to his wife, White withdrew consent for the search. Police officers thereafter obtained a search warrant, returned to the residence, and recovered a holster and a plastic-coated map with the route to the Byler residence marked in yellow.

The radio station and the radio station dumpster were searched. Police recovered from the dumpster a length of white cord and a blue steel Harrington and Richardson nine-shot .22 caliber revolver with the barrel sawed off. The white cord had similar characteristics to the rope found on Wanda Byler's wrist. Five of the bullets fired into Wanda Byler's body were fired from the gun found in the dumpster. The gun was one of two that Bobby Cole sold to White in March or early April, 1986.

Police found the abandoned Blazer in a wooded area adjacent to county road 3412 off of 3415. Boot prints near the Blazer were similar to ones found in the Byler garage and in two areas near the Byler house. The right boot taken from White's closet had fourteen points of similarity to the right boot print. The left boot had eleven points of similarity to the left print. Each of the boots had large notches cut out of the sole that did not match the prints. These notched areas were shinier than the rest of the soles and did not appear to be worn.

At trial White denied any involvement in the kidnapping and murder of Wanda Byler. He testified he met "Jim," that Jim gave him coffee, and that he was rendered unconscious. When he awoke, he found himself dressed in his camouflage clothes. Jim gave him the money and left.

White raises four points on appeal. He contends the trial court erred because it (1) failed to instruct the jury on the lesser included offense of second degree felony murder; (2) overruled his motion to suppress Kay Jordan's in-court identification because it was based on an unnecessarily suggestive photographic line-up; (3) permitted the prosecutor to ask a defense witness a question that resulted in testimony that was speculative, conclusory, and invaded the province of the jury; and (4) overruled his objection to prosecutor's closing argument that encouraged the jurors to misuse knowledge of his prior conviction.

■ White first contends the trial court erred because it failed to instruct the jury on the lesser included offense of second degree felony murder. Trial courts are obligated to instruct on lesser included offenses supported by the evidence. Section 556.046 RSMo 1986; *State v. Griffin*, 756 S.W.2d 475, 485 (Mo. banc 1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 3175, 104 L.Ed.2d 1036 (1988). An instruction on a lesser homicide offense will not be given, however, unless "there is a basis for a verdict acquitting the defendant of the offense charged *and* convicting him of the

included offense." Section 556.046.2 RSMo 1986 (emphasis added); *State v. Murray*, 744 S.W.2d 762, 773 (Mo. banc 1988), *cert. denied* 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988). Furthermore, when a defendant denies that he committed the act charged and no evidence mitigates the offense, no instruction on the lesser included offense is required. *State v. White*, 738 S.W.2d 590, 592 (Mo.App.1987).

■ White contends that the evidence that one of Wanda Byler's hands was free and that the box that normally contained the Byler gun was on the floor under the nightstand supports a theory that she freed herself during the course of the kidnapping and that White shot her only after she managed to get the gun. The evidence showed, however, that White shot Wanda Byler eleven times using four different guns. Only one of the bullets found in her body was fired from the Byler gun. The evidence thus supported the jury's finding of deliberation.

■ Moreover, the jury received instruction on conventional second degree murder, and failed to find a lack of deliberation for first degree murder. A second degree conventional murder instruction, not a second degree felony murder instruction, sufficiently tests a jury's belief of the crucial facts for a conviction of first degree murder. *Griffin*, 756 S.W.2d at 485. White suffered no prejudice because the jury never faced "an 'all or nothing' situation in which it might err on the side of conviction." *State v. Baker*, 636 S.W.2d 902, 905 (Mo. banc 1982). Point I is denied.

White next contends the court erred in overruling his motion to suppress Jordan's in-court identification because it was based on an unnecessarily suggestive photographic lineup. The photographic lineup contained photographs of seven persons, including White. Jordan knew five of the people in the photographs, including White. Four people in the lineup had facial hair although Jordan had told officers that the perpetrator had none.

■ An attack on *identification* testimony requires a two-step analysis. First, police procedures are examined to determine if they were impermissibly suggestive. Secondly, if they were, then the reliability of the in-court identification is considered. *State v. Martin*, 735 S.W.2d 124, 125 (Mo. App.1987). An out-of-court identification procedure that is suggestive does not invalidate a reliable in-court identification. *State v. Jones*, 735 S.W.2d 87, 89 (Mo.App. 1987). Reliability, not suggestiveness, determines admissibility. *Id.*

■ In determining reliability, a trial court must consider the totality of the circumstances, including (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior identification; (4) the degree of certainty demonstrated by the witness at the time of identification; and (5) the length of time between the crime and the identification. *State v. Charles*, 612 S.W.2d 778, 780 (Mo. banc 1981), *cert. denied*, 454 U.S. 972 (1988); *State v. Toney*, 680 S.W.2d 268, 275 (Mo.App.1984).

■ Prior to viewing the photographic line-up, Jordan had identified White by name. Jordan testified that she had decided during the offense that the perpetrator was White, a person she had known for at least twelve years. She had the opportunity during the offense to watch him from inside the Blazer for several minutes. Then she came to within a few feet of him. She was attentive, even to the extent of turning her head to get a better look after she was ordered to lie down. Jordan explained that she originally said the criminal looked like White because she was personally reluctant to accuse anyone. However, she had identified him to her husband as early as the afternoon of the day she was attacked. White relies on minor inaccuracies in Jordan's prior description such as eye color and weight, but Jordan consistently testified the perpetrator looked like White. Regardless of the photographic lineup, Jordan's identification of White at the time of the offense constitutes an independent basis for the reliability of the in-court identification. Point II is denied.

In his third point, White asserts that the trial court abused its discretion in overruling his objection and permitting the state to ask defense witness Wesley Speakes (hereinafter Speakes) whether the tread of his hiking boots pick up gravel when they are worn outside. White contends the testimony was speculative, conclusory, and that it invaded the province of the jury.

The trial court has wide discretion in admitting opinion or expert testimony. *State v. Boyd*, 706 S.W.2d 461, 465 (Mo. App.1986). A lay witness, however, must be restricted to statements of fact; opinion evidence is permitted only when the jury, from want of experience or knowledge, is unable to draw a proper conclusion. *Id.* Speakes testified he had boots similar to White's boots. He was never asked to give an opinion about White's boots, only to state from his experience whether his own boots picked up mud and dirt when he walked outdoors. He testified they might, "[j]ust depends on what type of—what type and shape of ground you are on." The jury remained free to draw its own conclusions about White's boots. Point III is denied.

In his fourth point, White contends the trial court erred in overruling his objection to the State's closing argument during the guilt phase of the trial because the prosecutor encouraged the jurors to misuse their knowledge of White's prior conviction as evidence of his guilt for the crime charged. White objected to the prosecutor's use of "That's what these kind of people will do." The expression was in the following context:

And, why is it important for Roy White to get up here and lie to you? Because camouflage paint, camouflage pants, camouflage jungle boots, he's wearing exactly the same thing that Kay Jordan said the perpetrator wore. And, she gave that description of him when she was shot in the head and had been mauled by Roy White. She said that the guy had jungle boots on, or she said he had camouflage on, and black face, and he looked like Roy White. And, low and behold, just a coincidence, just a coincidence that exactly the same time that the person who looked like Roy White, Roy White had on a camouflage uniform, and he had face black on, and he had no alibi. And, he was at the area. And, we know he had been out there lurking around this poor woman's house, this poor sole's [sic] house on Tuesday waiting to get her, stalking her, because he wanted the money.

As I listened to the facts of this case I couldn't help but think about the story of the Good Samaritan. I couldn't help but think about it, about the guy who got mugged and left on the side of the road to die. And, you know the story. Numerous people came by, and nobody helped him. And, finally, the Good Samaritan comes along and helped him and nursed him back to health.

But, what the story doesn't tell you is that the kind of guy who left him on the side of the road to bleed and die, that's Roy White. He didn't care about anybody except motorcycles, and money. And,—and where did all that money go that Roy—that these people paid him? He said well, it didn't go into his checking account.

I suggest to you, ladies and gentlemen: It went to pay off the last guy he swindled. That's what a paunsy [sic] scheme is. You've got to keep swindling, you've got to keep paying off,—

MR. FINNICAL: That's what these kind of people will do.

Roy White's credibility is next to nothing. He is a convicted thief.

Let me tell you something: Let me tell you a story: There was a guy—

MR. KESSLER: Your Honor, I am going to object to that last statement. He is arguing a prior conviction, and it's inconsistent with the action here, and that's improper. It can be used to impeach—

MR. FINNICAL: That's what I am doing.

MR. KESSLER: —his credibility, but not to argue that he acted consistently

with it. And even Mr. Finnical should know that.

THE COURT: The objection will be overruled.

MR. FINNICAL: He is a convicted thief. You can't believe what this guy testifies to.

■ When a defendant testifies, the prosecutor may use prior criminal convictions to reflect upon his credibility. *State v. Scott*, 716 S.W.2d 413, 416 (Mo.App. 1986). Use of a prior conviction as substantive proof that a defendant is guilty of the offense presently charged is, however, improper and prejudicial. *State v. Williams*, 728 S.W.2d 690, 693 (Mo.App. 1987).

■ Here, the prosecutor's argument began with a reference to White's motive for lying and to his lack of an alibi. Immediately following the allegedly objectionable sentence, the prosecutor, tied the prior conviction to White's credibility, not to the crime charged. Because the prosecutor's use of prior convictions reflected upon White's credibility, the trial court properly overruled the defense objection. The fourth point is denied.

■ White raises two points based on the denial of his Rule 29.15 motion without an evidentiary hearing. He contends the motion court erred in denying his motion without an evidentiary hearing because (1) his counsel was ineffective for failing to present the testimony of named witnesses who could have contradicted the State's evidence and in failing to have ballistics tests performed to establish the true identity of Jim and (2) the State used false testimony at his trial and failed to disclose evidence to the defense.

White was sentenced August 7, 1987. His *pro se* motion to vacate was timely filed on June 28, 1988, under Rule 29.15(m). On July 1, 1988, the motion court granted leave to proceed in forma pauperis and appointed the public defender to represent Movant. On August 9, 1988, counsel's motion for additional time to amend the motion was granted. A second motion for additional time and the amended motion

itself were filed on September 13, 1988. Rule 29.15(f) states:

> Any amended motion shall be verified by movant and shall be filed *within thirty days of the date counsel is appointed* or the entry of appearance by counsel that is not appointed. The court may extend the time for filing the amended motion *for one additional period not to exceed thirty days.* (Emphasis added.)

The time limitations found in Rule 29.15 are mandatory. *Day v. State*, 770 S.W.2d 692, 695 (Mo. banc 1989). Movant's motion to extend the time for filing an amended motion and the amended motion itself were untimely filed. The trial court had no authority to give additional time beyond that provided by the rule. *Sloan v. State*, 779 S.W.2d 580, 582 (Mo. banc 1989). Issues raised solely in the amended motion are "time barred and procedurally waived." *Id.* Because the issues concerning ineffectiveness of counsel were raised exclusively in the amended motion, our review is limited to those grounds found in Movant's *pro se* motion.

■ Movant's sole remaining claim is that the State used false testimony and failed to disclose evidence at his trial. Review of denial of a Rule 29.15 motion is limited to a determination of whether the findings and conclusions of the motion court are clearly erroneous. Rule 29.15(j); *Moton v. State*, 772 S.W.2d 689, 691 (Mo. App.1989). The findings, conclusions, and order of the motion court are clearly erroneous only if a review of the entire record leaves the appellate court with a definite and firm impression that a mistake has been made. *Id.* The motion court specifically concluded that the allegations concerned trial court error and are "the type that could have been or should have been presented to the trial court. These complaints do not rise to the level of constitutional violations as required for review under Missouri Supreme Court Rule 29.15(a)." Rule 27.26 (Repealed), the predecessor rule for post-conviction relief, provided that mere trial errors could not be brought within the scope of a motion for post-conviction relief by merely alleging a conclusion that a movant's constitutional rights were af-

fected. *Rainwater v. State,* 770 S.W.2d 368, 370 (Mo.App.1989). *Rainwater* extends that principle to Rule 29.15. The complaints alleged here concern trial error and are therefore outside the scope of Rule 29.15(a). The motion court's conclusion was not clearly erroneous.

The judgment of conviction and the judgment denying relief pursuant to Rule 29.15 are affirmed.

CARL R. GAERTNER and STEPHAN, JJ., concur.