STATE of Missouri, Plaintiff–
Respondent,

v.

John W. WILLIAMSON, Defendant–
Appellant.

John W. WILLIAMSON,
Movant–Appellant,

v.

STATE of Missouri, Respondent–
Respondent.

Nos. 58421, 59793.

Missouri Court of Appeals,
Eastern District,
Division Three.

July 14, 1992.

Motion for Rehearing and/or Transfer to
Supreme Court Denied
Aug. 12, 1992.

Jeanene Moenckmeier, St. Louis, Stephen J. Harris, Columbia, for appellant.

William L. Webster, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for respondent.

STEPHAN, Judge.

John W. Williamson appeals his convictions, after a three-day jury trial, of one count of first degree robbery, § 569.020, RSMo 1986; one count of armed criminal action, § 571.015, RSMo 1986; and one count of first degree burglary, § 569.160, RSMo 1986. Additionally, Williamson appeals the denial of his Rule 29.15 motion for post-conviction relief, without an evidentiary hearing. We have consolidated Williamson's two appeals, pursuant to Rule 29.15(*l*). We affirm.

The evidence adduced at trial, in the light most favorable to the verdict, is as follows. In December 1987, Williamson was working for Mitch Murch's Maintenance Management Company ("MMMM"). Sometime that month, Williamson went to the company office and reported to the receptionist that he was shorted on his paycheck. The receptionist called the payroll administrator, Sandra Cummings. Cummings spoke with Williamson about the alleged shortage. She told Williamson that there was nothing that she could do; Williamson would have to speak to the operations manager, Stacy Williams. Williamson went into Williams' office and had a discussion with Williams. As Williamson left the office, Williamson appeared to be very agitated. Williamson stated: "I'll get my money from Mitch Murch one way or another."

On January 6, 1988, the victim, Ann Daniels, was babysitting her grandson, Conner, at her daughter's home in University City. Her daughter's husband, Tim Murch, was the vice-president of MMMM. At approximately 1:00 p.m., Daniels put Conner down for a nap. She, in turn, laid down on the living room sofa. A few minutes later, Daniels got up to answer a knock at the side door. She observed a tall, slender, black man, wearing what she thought was a dark blue uniform or working clothes. Daniels stated: "[y]es, what is it?". The man, Williamson, replied: "[i]s this the Tim Murch residence?". As Daniels responded "yes", Williamson motioned to Daniels as though he was "handing [her] or delivering or wanting to give [her] something." When Daniels opened the door to take whatever Williamson had in his hand, he pushed in on the door. Although Daniels attempted to close the door, she was overcome by Williamson's power, and he pushed his way into the kitchen.

Williamson told Daniels not to scream or yell. He put her in a choke hold and pressed something into her back. Daniels believed that it was a gun. Williamson led Daniels throughout the house, checking to see if anyone was at home. While doing so, Williamson stated: "Tim owes me."

Williamson then demanded Daniels' purse and the money therein. Daniels gave him two hundred dollars. Williamson, thereafter, grabbed a knife out of the knife block and ordered Daniels to open the refrigerator. Daniels complied. Williamson told Daniels to take out a package of hot dogs. He then told her to pick up a bottle of liquid detergent. Williamson, subsequently, ordered Daniels to go down in the "cellar" and sit on the steps. As Williamson backed up the "cellar" stairs, closed the door and prepared to leave, he told Daniels not to tell anybody, not to call the police, not to do anything but to give him time to get away or he would shoot at the house. Williamson opened the door twice to see if Daniels was doing as he instructed. He, then, left.

The phone, upstairs, began ringing. On the third ring, Daniels ran upstairs and grabbed the phone. The person on the other end of the line, had, however, hung up. Daniels looked to see if anyone was in the house. Seeing no one, she ran to Conner's room, picked him up and ran to a neighbor's house. Someone, it is unclear whom, called the police. A couple of minutes later, the University City police arrived. After giving the police a description of Williamson, the police took Daniels to the University City police station to make a composite of her assailant. Additionally, the police had Daniels look at photographs. Daniels was unable to identify any of the photographs as a picture of her assailant. The police, thereafter, distributed the composite to officers, as well as to MMMM. Cummings recognized the composite to be the likeness of Williamson.

The police, therefore, obtained a black and white photograph of Williamson and placed it in an array of other black and white photographs. The next day, Daniels returned to the police station, where the police had her look at the array. Daniels stated that she was unable to identify any of the pictures as the perpetrator of the crime, since all of the subjects appeared too young.

On January 9, 1988, Daniels returned to her home in South Carolina. While there, Tim sent her four identification badges of people that he believed had reason to commit the crimes. Daniels looked only at the photographs on the badges, and recognized Williamson as being the individual who committed the crimes. She called Tim and identified her assailant. Daniels, subsequently, returned to St. Louis. The police, thereafter, arrested Williamson, and placed him in a physical lineup, which Daniels observed. Daniels positively identified Williamson as her assailant.

Williamson testified in his own defense. Additionally, he called three witnesses to testify on his behalf. However, at the close of the evidence, instructions and arguments of counsel, the jury found Williamson guilty of first degree robbery, armed criminal action and first degree burglary. On April 11, 1990, defense counsel filed a motion for judgment of acquittal, or, in the alternative, a motion for a new trial. On April 23, 1990, the trial court denied these motions. On May 11, 1990, the trial court sentenced Williamson to ten years imprisonment for first degree robbery, three years imprisonment for armed criminal action and five years imprisonment for first degree burglary. The court specified that the sentences for robbery and armed criminal action are to be served consecutively, while the sentence for burglary is to be served concurrent to the robbery sentence. On May 15, 1990, defense counsel filed Williamson's Notice of Appeal. On August 30, 1990, Williamson filed a *pro se* motion to vacate, set aside or correct the trial court's judgment or sentence, pursuant to Rule 29.15. On September 12, 1990, the trial court appointed the Special Public Defender's office to represent Williamson. On September 21, 1990, defense counsel filed Williamson's request for a change of judge, which the trial court later granted. After one extension of time, post-conviction counsel filed an amended Rule 29.15 motion on November 6, 1990. On January 9, 1991, the court issued Findings of Fact, Conclusions of Law, Order, Judgment and Decree, denying Williamson's motion. On February 15, 1991, Williamson filed his second Notice of Appeal. We have consolidated these appeals, pursuant to Rule 29.15(*l*).

Williamson's first point is that the trial court erred in overruling his motion for judgment of acquittal: (1) at the close of the State's case; (2) at the close of all evidence; and (3) notwithstanding the verdict. At the outset, we note that the State rested its case, and defense counsel made her opening statement and presented the testimony of three witnesses before she moved for a directed verdict at the close of the State's case. Thus, whether the evidence at the close of the State's case-in-chief was sufficient to support the conviction need not be determined because Williamson did not move for a judgment of acquittal at that stage of trial but proceeded to introduce evidence on his own behalf. *State v. Wood*, 553 S.W.2d 333, 334 (Mo.App.1977).

At the close of all the evidence, Williamson did, by motion, attack the sufficiency of the evidence. In addressing a challenge to the sufficiency of evidence at trial, an appellate court accepts as true all evidence, whether circumstantial or direct, tending to prove the defendant guilty, together with all reasonable inferences supportive of the verdict. *State v. Vitale*, 801 S.W.2d 451, 456 (Mo.App.1990). We ignore all contrary evidence and inferences. *State v. Davis*, 797 S.W.2d 560, 563 (Mo.App. 1990). Our review is limited to whether there is sufficient evidence from which reasonable persons could have found the defendant guilty. *State v. Moseley*, 705 S.W.2d 613, 616 (Mo.App.1986).

To sustain a conviction for first degree robbery, the State must prove that the defendant forcibly stole property, and in the course thereof he, or another participant in the crime,: (1) caused serious physical injury to any person; or (2) was armed with a deadly weapon; or (3) used or threatened the immediate use of a dangerous instrument against any person; or (4) displayed or threatened the use of what appeared to be a deadly weapon or dangerous instrument. § 569.020, RSMo 1986. The evidence, considered in the light most favorable to the verdict, indicates that on January 6, 1988, Williamson took $200.00 from Daniels. In the course of so doing, Williamson threatened the immediate use of physical force by stating that he would shoot at the house if Daniels did not give him time to get away. Additionally, Williamson displayed a deadly weapon or dangerous instrument when he grabbed a knife out of the knife block. Thus, there was sufficient evidence both to submit the first degree robbery count to the jury and upon which the jury could reasonably find Williamson guilty.

To sustain a conviction for armed criminal action, the State must prove that the defendant committed a felony by, with or through the use, assistance, or aid of a dangerous instrument or deadly weapon. § 571.015, RSMo 1986. First degree robbery is a felony. § 569.020, RSMo 1986. Since the evidence, considered in the light most favorable to the verdict, indicates that Williamson committed first degree robbery by, with or through the use, assistance, and/or aid of a dangerous instrument or deadly weapon (a knife), there was sufficient evidence both to submit the armed criminal action count to the jury and upon which the jury could reasonably find Williamson guilty.

Finally, to sustain a conviction for first degree burglary, the State must prove that the defendant entered unlawfully or knowingly remained in a building or inhabitable structure for the purpose of committing a crime therein, and when in effecting entry or while in the building or inhabitable structure or in immediate flight therefrom, he or another participant in the crime: (1) is armed with explosives or a deadly weapon; (2) causes or threatens immediate physical injury to any person who is not a participant in the crime; or (3) there is present in the structure another person who is not a participant in the crime. § 569.160, RSMo 1986. The evidence, viewed in the light most favorable to the verdict, indicates that Williamson knowingly and unlawfully entered the Murch's residence for the purpose of committing a crime therein (robbery), and, that while Williamson was in the Murch's residence, Daniels was present and was not a participant in the crime. Thus, there was suffi-

cient evidence both to submit the first degree burglary count to the jury and upon which the jury could find Williamson guilty. For these reasons, Williamson's first point is denied.

Williamson's second point is that the trial court erred in: (1) denying Williamson's pre-trial motion to suppress in-court and out-of-court identification of Williamson; (2) allowing exhibits 4A–4D (identification badges of three Contract Cleaning employees and one MMMM employee) and 5A–5B (lineup photos) to be admitted into evidence; and (3) allowing Daniels to make an in-court identification of Williamson. Williamson contends that Daniels' identification of him was unreliable because: (1) Daniels was unable to identify Williamson's picture in a photographic lineup the day after the commission of the crimes; (2) Daniels did not know who her assailant was and needed someone to point her assailant out to her; (3) at the urging of the police, Tim Murch sent four identification badges of possible suspects to Daniels; (4) the identification badges were so suggestive that Daniels had to pick out Williamson; (5) the provision of the identification badges, coupled with an impermissibly suggestive physical lineup, led Daniels to name Williamson as her assailant; and (6) the pre-trial procedures led both to Daniels' identification of Williamson at trial and to Williamson's conviction.

■ An attack on identification testimony requires a two-step analysis. First, we examine police procedures to determine if they were impermissibly suggestive. *State v. White*, 790 S.W.2d 467, 472 (Mo. App.1990). Second, if they were, then we consider the reliability of the in-court identification. *Id.* An out-of-court identification procedure that is suggestive does not invalidate a reliable in-court identification. *Id.* Reliability, not suggestiveness, determines admissibility. *Id.* In determining reliability, a trial court must consider the totality of the circumstances, including: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior identification; (4)

the degree of certainty demonstrated by the witness at the time of identification; and (5) the length of time between the crime and the identification. *Id.*

■ At the outset, we address Daniels' inability to identify the photograph of Williamson the day after the crime. Daniels explained that the people in the photographs that she viewed appeared to be too young to have been her assailant. The photograph at issue, which is black and white, was taken in 1973, and was approximately fifteen years old when Daniels viewed it. Williamson appears much younger in that photograph than in the photograph that was taken of him at the physical lineup. Thus, it is not unreasonable that Daniels was unable to identify Williamson's photograph.

■ We, therefore, turn to the other suggestive procedures of which Williamson complains. Initially, Williamson contends that the police urged Tim to send four identification badges of possible suspects to Daniels. This allegation is refuted by the record. At the motion to suppress hearing, Officer Margaret Armantrout, clearly stated that she had no idea that Tim was going to send Daniels identification badges of possible suspects until Tim's wife, Nan, notified Armantrout that Daniels had picked out a possible suspect. We defer to the trial court's superior opportunity to determine the credibility of the witnesses at the motion hearing. *State v. Stolzman*, 799 S.W.2d 927, 936 (Mo.App. 1990). When a police procedure is not at issue, but it is alleged that nongovernmental sources influenced the perception or memory of a witness, the trier of fact determines the extent to which the witness' perception or memory has been influenced. *Tidwell v. State*, 784 S.W.2d 645, 647 (Mo. App.1990). Here, the trial court could, quite properly, determine that Daniels' perception was not influenced by outside sources. Although three of the identification badges were of men from a company called Contract Cleaning and one (Williamson) was from MMMM, Daniels testified that she only looked at the photographs on

the badges. We defer to the trial court's determination.

Williamson next contends that the physical lineup was impermissibly suggestive because there was only one individual whose characteristics were similar to his. A lineup is not impermissibly suggestive merely because the individuals composing the lineup have dissimilar physical characteristics. *State v. Cooper*, 708 S.W.2d 299, 305 (Mo.App.1986). A reasonable effort to find physically similar participants is normally all that is required. *Id.* Differences in weight, age, height, hairstyle and other physical characteristics do not, therefore, compel a finding of impermissible suggestiveness. *Id.*

On the day of the lineup, neither the University City police department nor the St. Louis County Department of Corrections had any prisoners in custody who matched Williamson's description. The police found a University City employee that matched Williamson's characteristics and two other individuals who shared some of Williamson's physical characteristics. We hold that the police made a reasonable effort to find physically similar participants. The challenged photograph is not impermissibly suggestive.

Finally, we consider the reliability of the in-court identification. The record shows that Daniels viewed Williamson at the Murch's side door. She again viewed Williamson as he stood at the top of the "cellar" stairs. A high degree of attentiveness may be inferred because Williamson was an intruder in the Murch's house. Daniels' description of Williamson, which was reduced to a composite form, was so accurate that Cummings recognized the composite as being that of Williamson. Moreover, Daniels repeatedly testified that there was no doubt in her mind that Williamson was her assailant. Finally, within three weeks of the commission of the crimes, Daniels positively identified Williamson in both a photographic and physical lineup. In sum, we conclude that the pretrial procedures were not impermissibly suggestive. Thus, Williamson's arguments that: (1) the in-court identifications were

the product of the suggestive pretrial identification procedures; and (2) the court erred in admitting the photographic exhibits, are not meritorious. Williamson's second point is, therefore, denied.

Williamson's third point is that the trial court erred in overruling Williamson's motion in limine to exclude Joseph Barfield's testimony and notes and thereafter in admitting the same at trial despite Williamson's objections in that: (1) the evidence was hearsay; (2) the evidence was not prepared in the ordinary course of business; (3) the evidence was prepared solely for litigation; (4) the evidence was not the best evidence; (5) Barfield did not qualify as an expert; and (6) there was no foundation to qualify Barfield as an expert. Williamson contends that this destroyed his alibi defense, that on January 6, 1988, he was at the Missouri Division of Employment Security ("MDES") from 12:00 noon until approximately 2:00 p.m.

At the outset, we address Williamson's hearsay argument. Under the Uniform Business Records Act, § 490.680, RSMo 1986:

> A record of an act, condition or event, shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission.

The trial court is afforded broad discretion in determining whether a party has properly complied with § 490.680. *Waldron v. Ragland*, 716 S.W.2d 861, 862 (Mo.App. 1986).

At trial, Maureen Horst, a claims technician at MDES, testified that on January 6, 1988, she met with Williamson in order for Williamson to file a claim for unemployment compensation. She further testified that, when she completed Williamson's claim, she sent the claim, via a modem, to the MDES headquarters in Jefferson City.

Another witness, Joseph Barfield, who is a claim supervisor in the benefits section at headquarters, then testified that upon transmission of Williamson's claim to their office, MDES stored the claim in a log, which is kept in the ordinary course of business.

■ Where a business regularly employs electronic computer equipment to enter and store its business records, *printouts of the records are admissible as evidence under § 490.680 if, as the Act requires, the entries reflected are made in the regular course of business at or reasonably near the time of the occurrences of the events they record, and the trial court is satisfied that the sources of information and mode and time of preparation indicate trustworthiness, and hence justify admission.* SAB Harmon Ind. v. All State Bldg. Syst., 733 S.W.2d 476, 488 (Mo.App.1987). Based on testimony presented at trial, the trial court could have concluded that a printout of the log was a record made in the regular course of business, near the time of the events it recorded. The trial court could have also concluded that the sources of information and mode and time of preparation indicate trustworthiness and hence justified admission of the printout.

However, at trial, Barfield testified that the MDES routinely destroys computer records one year after they are made. As a result, Barfield explained that he did not have a printout available at trial. Barfield stated that he did, however, have notes reflecting his interpretation of the record governing Williamson's claim. Barfield explained that his notes indicated that Williamson completed his business at the MDES office at 11:55 a.m.

■ The best evidence rule does not preclude the introduction of secondary evidence; it merely embodies the law's preference for the best available evidence. *State v. Powell,* 648 S.W.2d 573, 575 (Mo.App. 1983). If the primary evidence is lost or destroyed, secondary evidence is admissible. *Id.* The trial court has wide discretion in determining the admissibility of secondary evidence. *Id.*

In *Powell,* the defendant distracted a store clerk and grabbed money out of the clerk's cash register. *Id.* at 574. At trial, the store manager provided evidence of the amount of cash that was missing by way of a cash register tape on which he had written the amount of cash that was in the clerk's register at the start of the day. *Id.* at 575. The manager explained that he copied that figure from a journal, which he prepared in the ordinary course of business. *Id.*

Our court determined that had the journal page been available, it would have been admissible as a business record. *Id.* However, the manager testified that he was not able to find the original page from the journal since the journal pages were routinely destroyed at the end of each month. *Id.* We held that there was sufficient evidence of the reliability of the figure on the adding machine tape to support the court's admission, over a best evidence objection, of that tape as secondary evidence of the starting amount recorded in the journal. *Id.* We additionally held that the adding machine tape was admissible under the business record exception to the hearsay rule since the store manager testified that he prepared these tapes in order to determine the amount of the shortage after the theft. *Id.* at 576. We stated:

That the record, in this instance, was prepared to determine how much cash had been stolen does not remove it from the business record exception to the hearsay rule. The fact that a record was made in anticipation of litigation does not render that record inadmissible. The relevant inquiry is whether the record was made in the ordinary course of business. *Bohn v. James,* 573 S.W.2d 448, 450 (Mo. App.1978). We believe this one was.

■ Applying the principles enunciated in *State v. Powell,* 648 S.W.2d 573 (Mo. App.1983), to the case at bar, we hold that since Barfield testified that he wrote his interpretation of the printout on a note which he kept in his file, there was sufficient evidence of the reliability of the information to support the court's admission of the note as secondary evidence of the time

that Williamson made his unemployment claim. Moreover, we hold that the note itself was admissible under the business record exception to the hearsay rule since Barfield testified that he both made notes and put the notes that he had made into his personal files in the ordinary course of business.

■■■■ Finally, Williamson contends that Barfield neither qualified as an expert nor was there any foundation to qualify him as an expert. Under § 490.680, RSMo 1986, a witness is qualified to testify regarding a business record if he or she has sufficient knowledge of the business operation and methods of keeping records of the business to give the records probity. *Stivers Lincoln–Mercury, Inc. v. Abbott*, 796 S.W.2d 923, 925 (Mo.App.1990). Such determination is largely within the trial court's discretion. *Pazdernik v. Decker*, 652 S.W.2d 319, 321 (Mo.App.1983). Barfield testified that he had been employed as a claims supervisor in the benefits section of the MDES for fifteen years. He also testified that, in this capacity, he gained experience dealing with the printout format and was responsible for supervising the entire computer system. We conclude that the trial court did not abuse its discretion in determining that Barfield was a qualified witness. Williamson's third point is, in its entirety, therefore, denied.

■■■■ Williamson's fourth point is that the trial court erred in: (1) failing to strike venireperson Lehnhoff for cause; and (2) striking venireperson Howard for cause. A criminal defendant is entitled to a full panel of qualified jurors before he is required to expend his peremptory challenges; denial of a legitimate request to excuse for cause a partial or prejudiced venireperson constitutes reversible error. *State v. Wheat*, 775 S.W.2d 155, 158 (Mo. banc 1989). To qualify as a juror, the venireperson must be able to enter upon that service with an open mind, free from bias and prejudice. *Id.* Determination of a potential juror's qualifications remains within the broad discretion of the trial court after consideration of relevant voir dire in its entirety. *Id.* Mindful of the trial court's unique opportunity to observe the venireperson during voir dire, an appellate court will not disturb a ruling on a challenge for cause unless it constitutes a clear abuse of discretion and a real probability of injury to the complaining party. *Id.*

■■■■ During voir dire, venireperson Lehnhoff stated that she "would like to hear [Williamson's] side" of the story. Initially, we note that a venireperson must be stricken for cause if he indicates that he might draw adverse inferences from a defendant's decision not to testify. *State v. Anderson*, 785 S.W.2d 299, 303 (Mo.App. 1990). However, a venireperson who expresses a personal opinion that a defendant should testify or present some evidence in his behalf is not necessarily disqualified as a juror. *Id.* If it appears reasonable to the trial court that the venireperson's opinion will yield and that he will determine the issues under the law, the venireperson is not subject to being excused for cause. *Id.*

Here, although venireperson Lehnhoff expressed a preference for hearing from Williamson, she stated that if Williamson chose not to testify, she would make a decision based on what was presented. She also stated that if the State failed to prove Williamson guilty beyond a reasonable doubt and Williamson presented no evidence, she would find him "more than likely, not guilty." Viewing this comment in context, we find the trial court did not abuse its discretion in failing to strike venireperson Lehnhoff.

■■■ Williamson also contends that the trial court erred in striking venireperson Howard. When the prosecutor questioned venireperson Howard regarding whether he could consider the full range of punishment for the crimes at issue, Howard stated that there was no way that he could do so because he believed that life imprisonment was "too steep."

■■■ The prosecution can demand that a potential juror be willing to consider all the penalties provided by state law. *State v. Webb*, 725 S.W.2d 901, 903 (Mo.App.1987). The State charged Williamson with first

degree robbery, a class A felony, which carries a maximum sentence of life imprisonment. § 569.020, RSMo 1986; § 558.011, RSMo 1986. Since venireperson Howard clearly stated that he was unwilling to consider all the penalties provided by law, the trial court did not err in striking him for cause.

▆ We note that Williamson argues that defense counsel rehabilitated venireperson Howard. The basis for this contention is the following exchange:

> [DEFENSE COUNSEL]: Mr. Howard, we'll go to you then. You said that you didn't know if you could consider the full range of punishment. If you were selected to sit on this jury and you were instructed as to the range of punishment, do you think you could follow the law and discuss the punishment with your fellow jurors if the Judge instructed you?
>
> [VENIREPERSON HOWARD]: Yes.

We are mindful of the trial court's unique opportunity to observe venireperson Howard during voir dire. Having done so, the trial court stated:

> The court in observing the witness noted throughout his examination that he has shown a reticence about taking the responsibility for the punishment. I don't believe that his answer of merely "yes" that was given in response to voir dire by the defense has adequately convinced this Court that he's able to consider the full range of punishment.

Since we are unable to conclude that the trial court abused its discretion, Williamson's fourth point is denied.

▆ Williamson's fifth point is that the trial court erred in sentencing him to consecutive sentences of ten years for first degree robbery and three years for armed criminal action, after the jury requested that the terms of all three verdicts be served concurrently, "if possible". A trial court has discretion to determine if sentences should run concurrently or consecutively. *State v. Loewe,* 756 S.W.2d 177, 184 (Mo.App.1988). Finding no indication that such discretion was abused, we defer to the

trial court's determination. Williamson's fifth point is denied.

Williamson's final point is that the motion court erred in denying his Rule 29.15 motion for post-conviction relief, without an evidentiary hearing. Appellate review of a motion court's findings and conclusions is limited to a determination as to whether the findings and conclusions are clearly erroneous. *State v. Dunmore,* 822 S.W.2d 509, 512 (Mo.App.1991). The motion court's findings and conclusions are *clearly erroneous only* if a review of the entire record leaves the appellate court with a definite and firm impression that a mistake has been made. *Id.*

Furthermore, to prove a claim of ineffective assistance of counsel, appellant must show that: (1) his attorney failed to exercise the customary skill and diligence that a reasonably competent attorney would exercise under similar circumstances; and (2) he was prejudiced thereby. *Id.* If an appellant fails to prove either of these points, his claim of ineffectiveness fails. *Id.* Additionally, in order to prove that he was prejudiced by his counsel's deficient performance, he must show that, but for his counsel's errors, a reasonable probability exists that there would have been a different outcome. *Id.*

Williamson's first contention is that his trial counsel was ineffective because she failed to present evidence that Daniels *failed to identify him at the first photo* lineup. We note that this issue was not presented to the trial court. Instead, Williamson presented the claim that his trial counsel failed to question Daniels regarding her inability to identify him at the *physical* lineup. Generally, an issue not raised in a motion under Rule 29.15 and not presented to the trial court for determination will not be considered on appeal. *Moton v. State,* 772 S.W.2d 689, 692 (Mo.App. 1989). However, due to the slight variance between the two issues, we will gratuitously review Williamson's contention. At trial, defense counsel specifically asked Daniels whether she identified anyone in a photo lineup. She stated she did not. Since

Williamson's claim is refuted by the record, it is without merit.

Williamson's second contention is that his trial counsel was ineffective in failing to question Daniels regarding the fact that she did not identify Williamson's shoes when she was questioned by the police immediately after the incident. This contention, too, is refuted by the record. Defense counsel asked: "Okay. When you saw [Williamson's] boots through the crack in the door, you didn't tell the police that, did you?" Daniels responded: "No, I didn't." This contention is, therefore, without merit.

 Williamson's final contention is that his trial counsel was ineffective in failing to call Tim Moore, the chief operations manager of MMMM, as a witness because Moore would have testified that Williamson had no motive to rob Daniels because after discussing the paycheck shortage with Moore, MMMM paid Williamson the disputed amount. As a general rule, the decision to call witnesses is a matter of trial strategy and will not support a finding of ineffective assistance of counsel. *State v. Fraction*, 782 S.W.2d 764, 770 (Mo.App.1989). To support a charge of ineffective assistance of counsel for failure to secure testimony of a defense witness, the defendant must show how the testimony of an alleged witness would have helped him and what that testimony would have been. *Id.*

The motion court concluded that Williamson's motion failed to specifically state what Moore's testimony would have been or that he would have testified if called. The court also concluded that Moore's testimony would not have provided Williamson with a viable defense. We agree. Even if Moore were willing to testify that Williamson had no motive to rob Daniels because, after discussing the paycheck shortage with Moore, MMMM paid Williamson the disputed amount, this testimony would not have constituted a viable defense. According to Williamson's own testimony, his dispute over his pay was not settled until January 12 or 13, 1988. This was well after the crimes occurred. Thus, since by

Williamson's own testimony, a financial dispute existed on January 6, 1988, and it could have been one of the motives for Williamson to commit the crimes in question, Williamson has failed to prove that a reasonable probability exists that a different outcome would have resulted had Moore testified. Williamson's sixth point is, therefore, denied.

For these reasons, we affirm both the trial court's and motion court's decisions.

PUDLOWSKI, P.J. and CRIST, J., concur.