STATE of Missouri, Respondent,

v.

Thomas D. MARTIN, Appellant.

No. WD 54382.

Missouri Court of Appeals, Western District.

July 21, 1998.

---

David L. Simpson, Asst. Public Defender, Columbia, for Appellant.

Philip M. Koppe, Asst. Atty. Gen., Kansas City, for Respondent.

Before HOWARD, P.J., and BRECKENRIDGE and SPINDEN, JJ.

HOWARD, Presiding Judge.

Thomas D. Martin was convicted of assault in the first degree, § 565.050.1, RSMo 1994, and armed criminal action, § 571.015.1, RSMo 1994. He now appeals, claiming that there was insufficient evidence to support the convictions, and that the trial court erred by refusing to submit to the jury his proposed instruction on assault in the third degree, by failing to *sua sponte* declare a mistrial after the prosecutor made allegedly improper remarks during closing argument, and by allowing his statements to police into evidence.

The State's main witness was the victim of the shooting, Harold Chancellor, who gave the following account of the incident. On the afternoon of July 5, 1996, he was visiting friends and relatives in a neighborhood near Kemper Arena in Kansas City, Missouri. As Chancellor was walking down the street in front of his aunt's house, he got into an argument with Corey Morris, and that argument escalated into a fistfight. Chancellor hit Morris a few times, and then Morris ran away.

Three or four hours later, Chancellor was sitting on the porch of his aunt's house with his infant cousin. Chancellor saw Martin approach the house from down the street, and he "knew that something was about to happen." Martin was joined by Morris, and the two came toward the house and began shooting at him. At trial, Chancellor described the scene as follows:

Q. Did you hear the shooting or did you see the shooting first?

A. I saw it and heard it. They came rushing up at me.

Q. Okay. Who was rushing first?

A. Corey.

Q. Okay. Could you see anyone behind him?

A. Thomas.

Q. Okay. And for the record, you keep referring to Thomas Martin, the defendant in this case?

A. Yes.

Q. You see Thomas. What is Thomas doing?

A. Shooting.

Q. Okay. Is he shooting up? Is he shooting straight?

A. Shooting right at me.

Q. Did he ever turn and run away?

A. No.

Chancellor picked up his cousin and started running. When he got to a neighbor's house, he pushed his cousin inside, and then was hit in the arm by a bullet.

Chancellor ran a bit further, and then curled into a fetal position on the ground. He saw Morris, Martin, and a third person he did not recognize. Morris approached him and began shooting at him from point-blank range as he stood over him. Remarkably, none of the shots hit Chancellor. While Morris stood over him, Martin remained in the middle of the street, shooting at his aunt's house so that the people inside couldn't come out to retrieve Chancellor.

When Morris stopped shooting, Chancellor stood up and began running. As he fled, the shooting resumed, with Morris, Martin, and the third person all firing at him. Eventually, he found refuge in a neighbor's house until the shooting stopped. Martin was arrested when he returned to the neighborhood three days later.

Martin testified in his own defense at trial, and stated that he and Morris drove together to the neighborhood where the incident occurred. Martin testified that he had a girlfriend who lived in the area, and, after letting Morris out of his car, he parked the car and walked to his girlfriend's house. Martin stated that, as he knocked on the door, he heard gunshots. He drew his pistol but dropped it in the street and ran from the scene. Martin testified that, when the gunfire stopped, he returned to retrieve the weapon. He said that, as he was picking up his gun, he saw a man come to the door of a

house and stare at him in a threatening manner, so he shot once in the air and the man withdrew.

Following the trial, Martin was convicted of one count of assault in the first degree and one count of armed criminal action. He was sentenced to concurrent prison terms of ten and three years, respectively, and this appeal followed.

■ In his first point on appeal, Martin claims that there was insufficient evidence to establish all of the elements of first-degree assault as defined in this case by Instruction No. 6, which combined the verdict director for first-degree assault with MAI–CR 3d 304.04 (defendant's responsibility for conduct of another person). In addition, Martin contends that there was insufficient evidence to support his conviction for armed criminal action, as that also required the State to prove that he committed first-degree assault as defined in Instruction No. 6.

Instruction No. 6 read in part as follows (the underlined portion is the language which Martin stresses in his brief):

A person is responsible for his own conduct and he is also responsible for the conduct of another person in committing an offense if he acts with the other person with the common purpose of committing that offense, or if, for the purpose of committing that offense, he aids or encourages the other person in committing it.

As to Count I if you find and believe from the evidence beyond a reasonable doubt:

First, that on or about July 5, 1996 in the County of Jackson, State of Missouri, *the defendant and another person* attempted to kill or cause serious physical injury to Harold Chancellor by shooting at him, and

Second, that *defendant* in the course of such conduct caused serious physical injury to Harold Chancellor, and

Third, that with the purpose of promoting or furthering the commission of that assault in the first degree, the defendant acted together with or aided another person in committing that offense,

then you will find the defendant guilty under Count I of assault in the first degree with serious physical injury.

■ Persons who act in concert to commit a crime are equally guilty. *State v. Rehberg*, 919 S.W.2d 543, 552 (Mo.App. W.D. 1995). A person is criminally responsible for the conduct of another when, either before or during the commission of an offense, with the purpose of promoting the commission of an offense, he aids or agrees to aid or attempts to aid such other person in planning, committing, or attempting to commit the offense. *State v. Burch*, 939 S.W.2d 525, 529 (Mo.App. W.D.1997); § 562.041.1(2), RSMo 1994. The evidence need not show that the defendant personally committed every element of the crime. *Burch*, 939 S.W.2d at 529.

■ Applying these principles to the case at bar, it is clear that there was sufficient evidence to convict Martin of first-degree assault on a theory of accomplice liability. It is also clear that the court attempted to instruct the jury on accomplice liability, despite Martin's suggestion that the State somehow elected to submit its case to the jury based on his having personally committed every element of the offense. Other paragraphs of the instruction indicate a purpose to instruct under a theory of accomplice liability, while inadvertently omitting such language from part of the instruction.

Because the specific problem, according to Martin, is that there was insufficient evidence to satisfy the faulty language of part of the instruction, it seems that Martin's real complaint is that the court misinstructed the jury as to the elements of first-degree assault as applied to this case. A similar claim was made in *State v. Jimmerson*, 891 S.W.2d 470, 473 (Mo.App. E.D.1994). There, as here, the court's instruction combined MAI–CR 3d 304.04 with the verdict instructor for the offense, and like here, the instruction asserted that the jury must find that the defendant personally committed one of the elements of the offense.

The Eastern District determined that the instruction, while faulty, did not warrant relief because it was not prejudicial. The court noted that other parts of the instruction cor-

rectly incorporated the language of MAI–CR 3d 304.04 concerning responsibility for the actions of others. 891 S.W.2d at 473. The court concluded that, "[b]ecause the faulty instruction could not reasonably be read in the context of the facts presented at trial to expand the likelihood of conviction or the gamut of defendant's criminal responsibility, we find that he has not been prejudiced by the instruction." *Id.* Applying the same rationale to the case at bar, we find that the faulty language in Instruction No. 6 was not prejudicial to Martin, and therefore he is not entitled to relief on appeal. Point denied.

■ In his second point on appeal, Martin claims that the trial court erred by refusing to submit to the jury his proposed instruction on assault in the third degree. Martin argues that, because of his own testimony that he fired his gun once into the air, the jury should have been given the opportunity to find him guilty of assault in the third degree, based upon the reckless discharge of a weapon.

■ As Martin asserts, a number of cases have held third-degree assault to be a lesser included offense of first-degree assault. *State v. Williams,* 784 S.W.2d 309, 311 (Mo.App. E.D.1990); *State v. Spencer,* 725 S.W.2d 54, 56 (Mo.App. W.D.1987). However, the trial court is not required to submit an instruction on a lesser included offense where the evidence fails to support such a submission. *State v. Dunlap,* 639 S.W.2d 201, 205–206 (Mo.App. E.D.1982). Put another way, if the greater of the two offenses encompasses all the legal and factual elements of the lesser, the greater includes the lesser; a lesser offense is not included in a greater offense unless it is impossible to commit the greater offense without first committing the lesser. *State v. Hogan,* 748 S.W.2d 766, 769 (Mo.App. E.D.1988).

■ Where two separate offenses are directed at separate victims, each necessarily requires proof of a fact that the other does not, and therefore one cannot be the lesser included offense of the other. *State v. Branch,* 743 P.2d 1187, 1191 (Utah 1987); *Almada v. State,* 108 Idaho 221, 697 P.2d 1235, 1238 (App.1985); *Adams v. United*

*States,* 466 A.2d 439, 443 n. 3 (D.C.App.1983). In the case at bar, Chancellor's testimony established an offense directed specifically at him, and Martin's testimony established an offense committed to influence another man standing in a doorway, and which, according to Martin's own proposed instruction, threatened "people in the West Bluff Housing Project." These two offenses had sufficient individual identities and purposes that the trial court did not err by refusing to instruct the jury on the lesser offense. *State v. Tomlin,* 864 S.W.2d 364, 368 (Mo.App. E.D.1993). Also, Martin denied that he committed the act charged, i.e., shooting at Chancellor, and this, too, supported the trial court's refusal to instruct on the lesser offense. *State v. White,* 790 S.W.2d 467, 472 (Mo.App. E.D. 1990).

■ Martin's third point on appeal concerns the fact that, during closing argument, the prosecutor told the jury that they did not have to believe that Martin committed each element of the offense in order to find him guilty. Martin contends that this portion of the argument was inconsistent with jury Instruction No. 6, and therefore the trial court committed plain error by failing to *sua sponte* correct the prosecutor or declare a mistrial.

As we observed in our response to Martin's first point on appeal, Instruction No. 6, though faulty, was an attempt to instruct the jury on accomplice liability, a theory which is consistent with the prosecutor's remarks during closing argument. Martin is not entitled to plain error relief on this point.

■ In his fourth point on appeal, Martin claims that the trial court erred by allowing into evidence his statements to police, in which he gave essentially the same account of the incident as he gave in his trial testimony. Martin contends that the statements were inadmissible because they were made after he had told the interrogating officer that he wanted a lawyer.

The interrogating officer testified at Martin's trial, and described what occurred when he had Martin read the Miranda waiver form out loud to him:

Q. During the reading of the Miranda paragraph, did anything happen?

A. He got about halfway through it and he asked me, "Can I have a lawyer with me?"

Q. What was his—what was your response?

A. I said, "That is your right." Then he asked me, "Can I have a public defender with me?" And I also advised him that was his right. Then he stated, I think, "I want a lawyer," and immediately said, "I didn't do anything, I don't need a lawyer," and he continued reading the form out loud.

Q. So that was all one continuous statement?

A. Yes.

Q. You didn't have time to do anything?

A. No.

Q. Okay. Now, after he stated, "I didn't do anything, I don't need a lawyer," did he then sign the Miranda waiver form?

A. Yes, he did.

Given the fact that Martin's remarks about counsel both (a) were contradictory and nearly simultaneous and (b) ended with the assertion he did not need a lawyer, the State argues that the ensuing statements were admissible either because Martin's request for counsel was not decisive or unambiguous, *State v. Scott,* 943 S.W.2d 730, 740 (Mo.App. W.D.1997), or because after his request he initiated further communications with the police. *State v. Mease,* 842 S.W.2d 98, 107 (Mo. banc 1992). We agree with the State that the statements were admissible, and that, even if they weren't, there was no reversible error because Martin's trial testimony was very similar to the objected-to statements. *State v. Roberts,* 785 S.W.2d 614, 617 (Mo. App. E.D.1990).

The judgment of the trial court is affirmed.

All concur.