STATE of Missouri, Respondent,

v.

**David Allen HAGENSIEKER, Appellant.**

No. SD 29261.

Missouri Court of Appeals, Southern District, Division One.

Sept. 28, 2009.

Motion for Rehearing or Transfer Denied Oct. 16, 2009.

William J. Fleischaker, Fleischaker & Williams, Joplin, for Appellant.

Chris Koster, Atty. Gen. and James B. Farnsworth, Asst. Atty. Gen., Jefferson City, for Respondent.

Before BATES, P.J., BARNEY, J., and BURRELL, J.

PER CURIAM.

David Allen Hagensieker ("Appellant") appeals his conviction for one count of the Class C felony of stealing, a violation of section 570.030.[1] Following a jury trial, Appellant was sentenced by the trial court to seven years in the Missouri Department of Corrections with execution of that sentence suspended and Appellant was placed on five years supervised probation. Additionally, he was ordered to pay $24,489.04 in restitution to the City of Carthage, Mis-

---

1. Unless otherwise stated, all statutory references are to RSMo Cum.Supp.2002.

souri ("the City"). The judgment of the trial court is affirmed.

Viewing the evidence in the light most favorable to the jury's verdict, *State v. Parsons*, 152 S.W.3d 898, 899–900 (Mo. App.2005), the record reveals Appellant owns property which borders the limits of the City. This property is bordered by Airport Drive on the south, Hazel Street on the west, and Missouri Avenue on the east. Located in the center of this property there is a "Super 6 Motel," a bar called "King Jack Sports Bar," and a mobile home. To the north of the motel and bar there is a storage unit and to the west there is a house referred to as the "Green House." To the east of the motel from north to south there is a house called the "Yellow House," two storage sheds, and a house referred to as the "Blue House." Prior to 2000, the entire property was outside of the City's limits and, thus, was not eligible for automatic sewer services from the City.

In April or May of 2000, the eastern portion of this property, where the Yellow House, the Blue House, and two storage sheds are located, was annexed into the City and became eligible for sewer services. At that time, Appellant arranged for the City to provide sewer services to the Blue House. In order to provide those services, the City installed a grinder pump just north of the Blue House which connected the Blue House to the City's sewer system via a pipe.[2] Appellant made no arrangements to have any of the other buildings on the property hooked up to the City's sewer system.[3]

In 2003, the City re-inspected Appellant's property, and discovered a large septic tank located in a small metal storage shed to the north of the grinder pump which had not been seen when the grinder pump was installed in 2000. There were two additional pipes coming into the septic tank from the west in addition to a pipe which went toward the location of the grinder pump. It was also discovered at that time that the pipe between the Blue House and the grinder pump had been capped off and there was a new, different pipe leading into the grinder pump from another location, presumably the newly discovered septic tank. The City's inspector, Lynn Shelley ("Ms. Shelley"), notified Appellant that he was to repair "all the plumbing that was not within code" and gave him an opportunity to correct the situation rather than immediately cutting off his sewer services.

In March of 2006, Steve McKarus ("Mr. McKarus"), an environmental supervisor with the Jasper County Health Department, spoke with Appellant about several complaints of open, standing sewage which had been received by his department. Appellant and Mr. McKarus walked the property at that time and discovered standing raw sewage in an area between the motel and the storage unit; in a ditch along Hazel Street; and in front of the Blue House near Airport Drive. The problem

2. The grinder pump was also referred to as a "lift station" in the record. It was described as "a manhole with the [C]ity's [grinder] pump inside of it. On the outside of this manhole cover there is a depression that would hold overflow of sewage and there was a sump pump in that [overflow] area." Notably, the sump pump also had a pipe attached to it that was traced out to a ditch in front of the Blue House where the sewage was being dumped into the open.

3. The City bills customers who use sewage services based on the square footage of the buildings on the property. There was testimony that the cost per month for Appellant to have hooked up all the buildings on the property to the City's sewer system was $445.48 per month.

was discussed at length with Appellant at that time and several re-inspections in the following weeks continued to reveal raw, open sewage in several locations.

On May 30, 2006, officials from the health department searched Appellant's property pursuant to a search warrant. Appellant was present at that time. During the search, it was discovered that sewage from the motel, the sports bar, and the mobile home was routed such that it all went to a holding "pit" located in a metal shed east of the motel and west of the two larger storage sheds.[4] Once the waste accumulated in this pit the piping system was such that it could either be pumped to the north towards the Yellow House where it was discharged into the open or it could follow the flow of gravity south toward the grinder pump installed by the City near the Blue House.[5]

On that same date, in order to determine if, in fact, sewage was flowing from the western portion of Appellant's property into the City's sewers, Mr. McKarus poured green dye into a "clean-out" near two valves which were located between the storage unit and the motel north of the pit and he injected water into the system with one of the City's water trucks. Mr. McKa-rus then traced the dye through the pit to the south and then to the grinder pump at the entrance to the City's sewer system and also into ditches on Hazel Street and Airport Road.[6]

On April 13, 2007, Appellant was charged with stealing by "appropriat[ing] sewer services, of a value of at least five hundred dollars ..." from the City for the period of time from June 1, 2003, to June 1, 2006. A trial was held on May 5, 2008, and May 6, 2008. At the close of all the evidence the jury convicted Appellant of violating section 570.030 and he was sentenced by the trial court as set out above. This appeal followed.

■ In his sole point relied on, Appellant asserts the trial court erred in denying his motion for judgment of acquittal at the close of all the evidence and his post trial motion for judgment of acquittal because there was "insufficient evidence produced at trial upon which a reasonable juror could have found [Appellant] guilty of felony stealing beyond a reasonable doubt. . . ." He maintains

there was no evidence from which a reasonable juror could infer that the element of appropriation took place be-

---

4. This pit was characterized as "[a] septic tank with a[n] overflow pit with a blue tub in it that contains a pump for taking overflow sewage to different parts of the property." Mr. McKarus reported such pits are not normal in conjunction with a septic system because septic tanks "need[ ] to be watertight and sealed so you don't have open sewage conditions accessible."

5. Sewage would only overflow and follow the flow of gravity south when the level of sewage in the pit reached a particular level; however, there was evidence that "not much flow" was necessary to cause the excess sewage to be diverted south toward the grinder pump near the Blue House.
When the pit was first examined by Mr. McKarus on August 30, 2006, the pipeline heading from the pit down to the City's grind-er pump was uncapped and a valve on the pipe was in the "open position." However, later that day an official from the City observed Appellant closing the valve and capping off the pipe that led to the City's grinder pump.

6. In addition to the pipelines and pumps already detailed, the City found numerous lateral lines and valves across Appellant's property that ran into different septic tanks or were emptying onto the open ground. The majority of the septic tanks were determined to then link together such that the overflow from the buildings, including the motel, was channeled to the previously mentioned pit and ultimately to the City's grinder pump near the Blue House.

cause there was no evidence that other than under artificially created conditions any wastewater could flow from [Appellant's] septic system to the location of the grinder pump connecting to the City['s] sewer system and there was no evidence that even if wastewater reached the location of the grinder pump that it had ever been pumped into the City's sewer system or that more than $500 worth of services had been obtained.

 We will affirm a trial court's denial of a motion for judgment of acquittal if, at the close of evidence, there was sufficient evidence from which reasonable persons could have found the defendant guilty of the charged offense. *State v. Barnes*, 245 S.W.3d 885, 889 (Mo.App.2008). In determining if a submissible case has been made, this Court

> must look to the elements of the crime and consider each in turn,[ is] required to take the evidence in the light most favorable to the State and to grant the State all reasonable inferences from the evidence. [This Court] disregard[s] contrary inferences, unless they are such a natural and logical extension of the evidence that a reasonable juror would be unable to disregard them. Taking the evidence in this light, [the Court] consider[s] whether a reasonable juror could find each of the elements beyond a reasonable doubt.

*State v. Grim*, 854 S.W.2d 403, 411 (Mo. banc 1993). " 'The trier of fact determines the credibility of the witnesses, and may believe all, some or none of the testimony of a witness.' " *State v. Burse*, 231 S.W.3d 247, 251 (Mo.App.2007) (quoting *State v. Warren*, 141 S.W.3d 478, 490 (Mo.App. 2004)). " 'Circumstantial evidence is given

the same weight as direct evidence and the jury is free to make reasonable inferences from the evidence presented.' " *State v. Hoosier*, 267 S.W.3d 767, 770 (Mo.App. 2008) (quoting *State v. Brooks*, 158 S.W.3d 841, 848 (Mo.App.2005)). "The function of the reviewing court is not to reweigh the evidence, but only to determine if the evidence is supported by sufficient evidence." *Burse*, 231 S.W.3d at 251.

Section 570.030.1 sets out that "[a] person commits the crime of stealing if he or she appropriates property or services [7] of another with the purpose to deprive him or her thereof, either without his or her consent or by means of deceit or coercion." To " '[a]ppropriate' means to take, obtain, use, transfer, conceal or retain possession of . . . ." § 570.010(2).

Here, Appellant does not challenge the fact that the stealing statute, section 570.030.1, covered the offense of stealing services nor does he challenge the fact that sewage services falls within the definition of services under section 570.010(14). Rather he complains there was no evidence introduced at trial to prove he appropriated sewer services from the City because the mere fact that he was connected to the City sewer system does not prove that he "used" the City's sewer services. He maintains that because there was no evidence "that any sewage actually flowed from the property in question into the [City's] sewer system the State failed to establish the *corpus delicti* . . . " of the crime charged.

In support of this argument, Appellant cites this Court to *State v. Celmars*, 399 S.W.2d 145, 147 (Mo.App.1966), and *State v. Walker*, 365 S.W.2d 597, 601 (Mo.1963).

---

7. "Services" are defined as including "transportation, telephone, electricity, gas, water, or other public service, accommodation in ho-

tels, restaurants or elsewhere, admission to exhibitions and use of vehicles . . . ." § 570.010(14).

In *Celmars*, 399 S.W.2d at 146, a bench tried case, the defendant was charged with stealing sixteen cartons of cigarettes from a grocery store. At trial, one of the store employee's testified that she "saw the defendant walking around inside the store and noticed that in spite of the fact it was a warm June day he was wearing a suit coat and a topcoat." *Id.* The defendant then left without purchasing anything. *Id.* When the employee's shift ended a few minutes later, she saw the defendant outside the store with "cartons of cigarettes . . . sticking out of his suit pocket." *Id.* She alerted authorities, who made contact with the defendant, and the authorities discovered sixteen cartons of cigarettes in a paper bag under a piece of cardboard near the defendant. *Id.* The defendant told the officers he purchased the cigarettes from a friend. *Celmars*, 399 S.W.2d at 146. At trial, the grocery store employees were unable to state definitively whether the cigarettes had been purchased or stolen from their store. *Id.* at 147. The defendant was convicted of stealing the cigarettes. *Id.* at 146.

On appeal, the reviewing court in *Celmars* set out that the *corpus delicti* " 'must be established in every criminal prosecution before a conviction can be sustained,' " and that while " 'it may be established by circumstantial evidence, the courts, and particularly the trial courts, should see to it that the evidence is cogent and convincing, and excluding all other reasonable hypotheses.' " *Id.* at 147 (quoting *State v. Jones*, 106 Mo. 302, 17 S.W. 366, 369 (1891)). The court then found an absence of a *corpus delicti;* determined the " 'evidence in the instant case does not exclude all other reasonable hypotheses;' " found there was "no evidence, direct or circumstantial, to show the[ ] cartons of cigarettes were stolen;" and reversed the conviction. *Id.* (quoting *Jones*, 17 S.W. at 369).

In *Walker*, 365 S.W.2d 597, 601 (Mo. 1963), the defendant was charged with stealing a chainsaw, which had last been seen sitting near a road on the victim's property. The defendant had been seen in the area on the evening of the chainsaw's disappearance and there was testimony that he was acting suspicious at that time. *Id.* at 589–600. The chainsaw was later recovered "laying back under some logs and an old drift in about the middle of Buffalo Creek." *Id.* at 600. The defendant was convicted of stealing and appealed. *Id.* at 600–01. In holding there was insufficient evidence upon which to convict the defendant, the appellate court stated it searched the record and found

> no incriminating circumstances other than suspicious conduct and an opportunity on the part of the defendant and his companions to commit the theft. These circumstances alone are not *inconsistent and irreconcilable with the defendant's innocence and do not point so clearly and satisfactorily to guilt as to exclude every reasonable hypothesis of innocence.*

*Walker*, 365 S.W.2d at 601–602 (emphasis added). Accordingly, the defendant's conviction was reversed.

However, the cases cited by Appellant are not persuasive. First, the standard for evaluating the sufficiency of the evidence and the law of circumstantial evidence in general has changed since *Celmars* and *Walker* were decided. In *Grim*, 854 S.W.2d at 405–07, our high court rejected the prior circumstantial evidence rule, as partially quoted in *Walker* above, as the standard for reviewing the sufficiency of the evidence and re-affirmed the principle for evaluating the sufficiency of the evidence as enunciated in *State v. Dulany*, 781 S.W.2d 52, 55 (Mo. banc 1989),

and *Hoosier*, 267 S.W.3d at 770, as quoted above.

Second, the facts in *Celmars* and *Walker* are vastly different from the facts in the instant case in that, here, both direct and circumstantial evidence and the reasonable inferences derived therefrom, when viewed in the light most favorable to the verdict, support the jury's finding of guilt beyond a reasonable doubt. In the instant matter, there was probative, circumstantial evidence from which the jury could infer Appellant was illegally pumping waste from his property into the sewer system of the City. *Hoosier*, 267 S.W.3d at 770. As previously recited, in 2003 the City inspected Appellant's property and discovered a large septic tank located in a small metal storage shed to the north of the Blue House. There were two additional pipes from the west which ran into this septic tank; however, the pipe between the Blue House and the City's grinder pump had been capped off and there was a new and different pipe leading into the City's grinder pump from the newly discovered septic tank.

Later, in May of 2006, officials from the health department discovered that sewage from the motel, the sports bar, and the mobile home was routed such that it all went into a pit located to the east of the hotel near one of the large storage sheds. This pit contained a septic tank with a pump to direct waste north to open discharge points, and it also housed an overflow area for waste to accumulate in when the septic tank became too full. The septic tank had two holes in the side of it such that any sewage that got to the level of the holes would drain out into the pit. The very existence of the open overflow pit created an inference that there were overflow problems on the property. Additionally, there was testimony from Appellant's brother that the overflow of water in the septic system had been a constant problem which was "so massive that [Appellant] had to pump it up away from everything all the time" and a valve system had to be designed to manually redirect waste to areas that were less saturated than others.

Regarding the waste in the pit, when City officials put green dye and water into Appellant's pipes from a point northwest of the pit, the green dye clearly flowed through connecting pipes to the septic tank attached to the grinder pump which had been installed by the City. We defer to the jury in issues relating to the credibility of witness testimony. *Burse*, 231 S.W.3d at 251. As already stated, the jury is free to make reasonable inferences even from circumstantial evidence because such evidence is given the same weight as direct evidence. *Hoosier*, 267 S.W.3d at 770. From these facts, the jury could reasonably infer that the pipe dumping waste into the grinder pump was coming from the hidden septic tank which was filled with waste overflowing from the pit to the north. *See Grim*, 854 S.W.2d at 411.

Furthermore, at $445.48 per month from 2003, at about the time the City had re-inspected Appellant's property and first discovered a large septic tank located in a small metal storage shed to the north of the City's grinder pump, until mid 2006, when officials from the health department searched Appellant's property, it is apparent Appellant used substantially more than $500.00 worth of the City's sewage services as a result of being connected to the City's sewage system. There was sufficient evidence presented from which the jury could find Appellant appropriated sewer services from the City such that he was guilty of the crime of stealing. The trial court did not err in denying Appellant's motions for judgment of acquittal. Point One is denied.

The judgment of the trial court is affirmed.