STATE of Missouri, Plaintiff–
Respondent,

v.

Kenneth WARE, Jr., Defendant–
Appellant.

No. SD 29794.

Missouri Court of Appeals,
Southern District,
Division One.

Nov. 16, 2010.

Stuart P. Huffman of Springfield, MO, for Appellant.

Chris Koster, Atty. Gen., Shaun J. Mackelprang, Asst. Atty. Gen. of Jefferson City, MO, for Respondent.

JEFFREY W. BATES, Judge.

A jury convicted Kenneth Ware, Jr. (Defendant) of robbery in the first degree and armed criminal action. *See* §§ 569.020, 571.015.[1] On appeal, Defendant presents eight points of alleged error. Finding no merit in any of these points, we affirm. For ease of analysis, we address Defendant's points out of order.

### Points II and III

Defendant's second and third points challenge the sufficiency of the evidence to support his conviction. We view the evidence and all reasonable inferences derived therefrom in the light most favorable to the verdict; all contrary evidence and inferences are disregarded. *State v. Belton,* 153 S.W.3d 307, 309 (Mo. banc 2005). "We defer to the jurors' superior position to weigh and value the evidence, determine the witnesses' credibility and resolve any inconsistencies in their testimony." *State v. Lopez–McCurdy,* 266 S.W.3d 874, 876 (Mo.App.2008). Viewed from this perspective, the following evidence was presented at trial.

Shortly before 8:00 p.m. on December 18, 2004, Mary Strozewski (Victim) drove to the Wal–Mart in Ozark, Missouri to go shopping. After making her purchases, she walked through the parking lot to her car. Her purse contained her wallet, a small amount of cash, a credit card, a bank debit card, her reading glasses, an EBT card and the PIN needed to use it.[2] Vic-

---

1. All references to statutes are to RSMo (2000).

2. EBT stands for "Electronic Benefit Transfer" and is the method by which eligible

tim had opened the driver's door to her car and placed her purse on the seat when someone yelled at her. As she turned to her left toward the voice, Defendant was standing about six inches away. He backed Victim against her door, so she could not move. Victim was able to see Defendant's face and clothing. He was a black male approximately the same height as Victim, who was 5′6″ tall. Defendant was wearing dark clothes and a black hooded sweatshirt. He displayed a steak knife with a serrated blade in his right hand. Defendant jabbed the knife toward Victim's stomach and demanded her purse. Victim complied, and Defendant told her to get in her car and drive away. Defendant went behind Victim's car and disappeared into a row of cars. Victim reported the theft to Wal–Mart employees, who called the police.

Officer Scott Forrester of the Ozark Police Department met Victim inside the store. She told Officer Forrester what had happened and gave him a description of the robber. Victim stated that "[s]he was sure that she got a good look at him and she could identify him." After speaking with Victim, Officer Forrester reviewed Wal–Mart's parking lot surveillance video. He observed a blue 1990's model Chevrolet Cavalier (the Cavalier) one lane over from Victim. The Cavalier was driving very slowly and pacing Victim. The Cavalier stayed even with Victim as she was walking out toward her vehicle. The Cavalier then parked one row away from Victim. A dark figure got out of the vehicle, approached Victim and then returned to the Cavalier. As Officer Forrester watched the Cavalier on the videotape, he noticed three unusual features on the car: (1) it lacked regular license plates; (2) it had aftermarket chrome spoke wheels or hubcaps; and (3) there was

something in the upper-back left window that might have been a temporary license plate.

After taking Victim's statement, Officer Forrester returned to the police department. He described the suspect vehicle that he had seen in the surveillance videotape to other officers. Based upon information provided by Officer Jared Roderick, Officers Forrester and Roderick went to a residence in the Oak Hill subdivision in Ozark. The officers arrived approximately four hours after the robbery had occurred. The Cavalier, which lacked license plates and had aftermarket hubcaps and a temporary license plate in the upper left corner of the rear window, was parked in front of the house. Officer Justin Clamors, Officer Michael Bryan and Detective David Southard also arrived at the house to assist in the investigation.

Officer Forrester spoke with Brianne Coffman (Coffman), who was one of the residents of the house. Officer Forrester learned that the Cavalier was owned by Lunda Croney (Croney). She told Officer Forrester there was no black male in the home. Officers Clamors and Bryan were guarding the back of the house. From that vantage point, Officer Bryan could see into the living room, kitchen, hallway and back bedroom. He could see a female resident speaking with Defendant in the bedroom. Coffman refused to allow police to enter the residence. After a discussion with Detective Southard, however, Coffman's father as lessee of the house consented to a search of the premises. Detective Southard and Officers Forrester and Roderick entered the house. Officer Clamors radioed that there was a male running out the back. Officer Clamors apprehended Defendant in the back yard as he tried to flee. On December 23, 2004,

households receive and use food stamp bene- fits.

Victim was shown a photographic lineup containing six pictures. Victim picked Defendant's photograph from the lineup.

Defendant contends the trial court erred in denying his motions for judgment of acquittal filed at the close of the State's evidence (Point II) and at the close of all of the evidence (Point III).[3] Defendant argues that the State presented insufficient evidence to prove guilt beyond a reasonable doubt because the evidence against him was circumstantial. Appellate review is limited to determining whether there was sufficient evidence from which a reasonable trier of fact could have found each element of the offenses to have been established beyond a reasonable doubt. *State v. Reed,* 181 S.W.3d 567, 569 (Mo. banc 2006).

■ The first charge against Defendant was first-degree robbery, which can be committed four different ways. § 569.020.1(1)–(4). Defendant was charged with a violation of § 569.020.1(4). In the context of this case, the required elements of that offense are: (1) Defendant forcibly stole property from Victim; and (2) in the course thereof, Defendant displayed or threatened the use of what appeared to be a deadly weapon or a dangerous instrument. *State v. Woodson,* 140 S.W.3d 621, 628 (Mo.App.2004).[4] Victim testified that her purse was stolen at knifepoint in the Wal–Mart parking lot by Defendant. During the encounter, Defendant jabbed the knife toward Victim's stomach while demanding her purse. She positively identified Defendant as the robber during the photo lineup and again at trial. Victim's eyewitness testimony alone is sufficient to support Defendant's conviction for first-degree robbery. *State v. Barnes,* 693 S.W.2d 331, 332 (Mo.App.1985). Forcible stealing includes the use or threatened use of physical force to compel the owner to deliver up his or her property. § 569.010(1); *State v. Merrick,* 257 S.W.3d 676, 683 (Mo.App.2008). Victim's testimony that Defendant used a steak knife with a serrated blade to commit the robbery was sufficient evidence from which the jury could find that forcible stealing had occurred. *Martin v. State,* 187 S.W.3d 335, 340 (Mo.App.2006) (defendant's act of placing knife near victim's throat and taking his property constituted forcible stealing). Victim's testimony that Defendant displayed and threatened to use the knife was sufficient evidence from which the jury could find that Defendant used a dangerous instrument during the course of the robbery. *See id.* (a knife used in a threatening manner is a dangerous instrument).

■ The second charge against Defendant was armed criminal action. § 571.015.1. The elements of this crime are: (1) Defendant committed a felony; and (2) that crime was committed "by, with, or through the use, assistance, or aid of a dangerous instrument or deadly weapon[.]" *Id.* First-degree robbery is a class A felony. § 569.020.2. "A knife used in a

---

**3.** We address Points II and III together because the issue and relevant evidence is the same. Defendant moved for judgment of acquittal at the close of the State's evidence. After that motion was denied, he attempted to call an expert witness to testify. Consistent with a pretrial ruling on a motion in limine, the court excluded the testimony and permitted defense counsel to make an offer of proof. Defendant rested without presenting any evidence, and there was no rebuttal evidence by the State. Therefore, the propriety of the trial court's rulings must be assessed by reviewing the evidence presented by the State during its case-in-chief.

**4.** Forcible stealing is defined in § 569.010(1). Stealing is defined in § 570.030. Because Defendant does not contend the evidence was insufficient to meet these requirements, no further discussion of either definition is required.

threatening manner is a dangerous instrument." *State v. Jackson*, 865 S.W.2d 678, 680 (Mo.App.1993). Victim's testimony provided sufficient evidence from which the jury could find Defendant guilty beyond a reasonable doubt of armed criminal action. *See, e.g., State v. Williamson*, 836 S.W.2d 490, 495 (Mo.App.1992) (evidence that defendant used a knife during a robbery was sufficient for the jury to find him guilty of armed criminal action).

■ Defendant's complaint that the evidence against him was "circumstantial" is unpersuasive. Victim's eyewitness testimony constituted direct evidence of Defendant's participation in these crimes. *State v. Watkins*, 804 S.W.2d 859, 860 (Mo.App. 1991). This evidence alone was sufficient for the jury to find Defendant guilty. *State v. Williams*, 277 S.W.3d 848, 853 (Mo.App.2009). Moreover, a jury is entitled to give circumstantial evidence the same weight as direct evidence when drawing reasonable inferences from the evidence presented. *State v. Minner*, 311 S.W.3d 313, 324 (Mo.App.2010); *State v. Hagensieker*, 299 S.W.3d 302, 305 (Mo. App.2009). The surveillance videotape showed that the Cavalier was used during the robbery. When police located the Cavalier about four hours later parked in front of a house, Defendant was found inside. He attempted to flee when police entered the residence. The jury could infer consciousness of guilt from Defendant's flight. *See State v. Eoff*, 193 S.W.3d 366, 377 (Mo.App.2006). The circumstantial evidence connecting Defendant to these crimes was strong, and the jury was entitled to rely upon such evidence, as well as Victim's testimony, to find Defendant guilty. Points II and III are denied.

## *Point VIII*

Defendant's eighth point relates to the judge's denial of a request to quash the entire venire. The following facts are relevant to this allegation of error.

After the venire panel was sworn by the clerk and MAI–CR 3d 300.02 was read, venireperson Maggard raised her hand and stated:

VENIREPERSON MAGGARD: I wanted to know something. This morning when we were sitting out here in the deal, he was talking to us.

THE COURT: He?

VENIREPERSON MAGGARD: The— the guy up there.

THE COURT: Okay.

VENIREPERSON MAGGARD: The defendant.

THE COURT: All right.

VENIREPERSON MAGGARD: And I know where he is from. I know what he is saying and everything. So I don't feel like that I could—

THE COURT: Tell me your number, ma'am.

VENIREPERSON MAGGARD: Fifteen.

THE COURT: Okay. And what's your name?

VENIREPERSON MAGGARD: Judy Maggard.

THE COURT: Okay. We'll probably ask you some more questions about that in a few minutes.

VENIREPERSON MAGGARD: Okay.

During the State's voir dire, the prosecutor asked Maggard about this incident. The following colloquy occurred:

Now, Ms. Maggard, you explained to us a while ago that the defendant was talking to different people?

VENIREPERSON MAGGARD: I was sitting here and he was sitting over here and—

[PROSECUTOR]: Outside—outside in the hallway?

VENIREPERSON MAGGARD: Yeah. And he wanted to know something about if we was the jurors or something. I think is what he said. I couldn't hear him very well. But he did tell me where he is from and he said "I didn't do it."

[PROSECUTOR]: Okay. Is that going to make it difficult for you to sit as a juror?

VENIREPERSON MAGGARD: Yes, it is. Because, I mean, if he says he's not going to do it. I'm—you know, I feel like I already made up my mind one way or the other.

[PROSECUTOR]: Okay. Thank you, Ms. Maggard, I appreciate it. Is there anyone else that heard the defendant talking when you were out there? Yes, ma'am, state your name and number?

VENIREPERSON HOLT: Claudia Holt, 48. I heard the same thing.

[PROSECUTOR]: Did that—did you make up your mind with that?

VENIREPERSON HOLT: Yes, I did. He said that it's been going on for five years.

[PROSECUTOR]: Four.

VENIREPERSON HOLT: Well, he said five. That he came down here for like a week, week and a half, and that's been—he was accused of doing this.

[PROSECUTOR]: Okay. All right. Your name again, ma'am?

VENIREPERSON HOLT: Claudia Holt.

[PROSECUTOR]: Holt?

VENIREPERSON HOLT: Holt.

[PROSECUTOR]: All right. Anyone else that you heard what the defendant was saying, and it—you made your mind up? Or if you heard what he was saying, that's what I want to find out first. Anyone else heard him or talk to him? Is there anyone here after hearing a couple of jurors saying, like Ms. Mag-gard and Ms. Holt, I've made my mind up? Is there anyone here who, because of what you heard, you made your mind up, and that's it? All right. I see no response.

When the court took a recess, defense counsel moved to quash the panel:

[DEFENSE COUNSEL]: Judge, based on the comments of two jurors that the defendant may have had communication with them, including statements professing innocence and talking about how long the case had been going on, those statements were then addressed to the entire panel. Uh, my concern is at this point that panel itself should be quashed due to the taint of the individual. I understand the problem that I'm dealing with is it's coming from the defendant's own conduct. But my concern about it is that it makes it look like the defendant is out there almost in a panhandling or begging for sympathy from the jury. And obviously it concerns me that other jurors may have heard that information and would hold that against defendant at deliberations. Based on that type of conduct, I would request that at this time the Court quash the panel, um, for purposes of fair trial toward the defendant.

THE COURT: Comments, [prosecutor]?

[PROSECUTOR]: No. Other than the fact that I object to it and ask you to overrule it. This trial has taken four years plus to get to this point. And I can't—you know, it is from the defendant's own responsibility. And if anybody should be asking for a quashing of the panel it would be me, and I'm not.

THE COURT: Seems self-induced, [defense counsel]. Request is denied.

Maggard and Holt were struck for cause and did not serve on the jury.

Defendant contends the trial court erred by denying the motion to quash the venire. Defendant argues that this ruling deprived him of a fair and impartial jury. We disagree.

A trial court has broad discretion in determining whether a venire panel should be dismissed, and the court's ruling will not be disturbed on appeal absent a clear abuse of discretion. *State v. Evans*, 802 S.W.2d 507, 514 (Mo. banc 1991). A trial court abuses its discretion only if its ruling is clearly against the logic of the circumstances then before the court, and the ruling is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *State v. Fassero*, 256 S.W.3d 109, 115 (Mo. banc 2008). The trial court's denial of the motion to quash the venire is presumed correct, and it is the defendant's burden to demonstrate otherwise. *State v. Stewart*, 296 S.W.3d 5, 10 (Mo.App.2009). A comment made by a particular venireperson does not require dismissal of the entire venire unless the statement was so inflammatory and prejudicial as to infringe upon a defendant's right to a fair trial. *State v. Thompson*, 985 S.W.2d 779, 789 (Mo. banc 1999).

Defendant has failed to demonstrate any prejudice resulting from the comments made by venirepersons Maggard and Holt. Neither venireperson expressed an opinion that Defendant was guilty of the charged crime. Based upon our review of the transcript, the trial court and other venirepersons reasonably could have concluded that Maggard and Holt believed Defendant's statement that he was innocent. Because the comments by these two venirepersons did not create any negative connotation toward Defendant, he failed to meet his burden of proving any prejudice resulting from the remarks. *Stewart*, 296 S.W.3d at 10; *Glasgow v. State*, 218 S.W.3d 484, 488 (Mo.App.2007); *State v. Taylor*, 166 S.W.3d 599, 609 (Mo. App.2005). In addition, the prosecutor inquired of the venire whether anyone else had been affected by hearing the comments made by Maggard and Holt. No one responded. The trial judge was in the best position to determine the effect of these allegedly improper comments on other members of the venire. *Stewart*, 296 S.W.3d at 10. Finally, it is well-settled that a criminal defendant may not seek relief from a judgment based upon an error committed at his instance. *State v. Knese*, 985 S.W.2d 759, 775 (Mo. banc 1999). The trial court did not err in denying Defendant's motion to quash the venire panel. Point VIII is denied.

### Point I

Defendant's first point posits error in the trial court's decision to overrule a *Batson* objection to the prosecutor's use of a peremptory challenge after voir dire was completed.[5] The following facts are relevant to this allegation of error.

Miguel Montiel, a Hispanic male, was the 22nd person on the venire. He was the only minority on the venire. He did not respond to any of the questions asked by the prosecutor or defense counsel during voir dire. When the prosecutor sought to use one of his peremptory challenges against Montiel, defense counsel asserted a *Batson* objection. The prosecutor gave three reasons for peremptorily challenging Montiel: (1) the prosecutor got no information from Montiel because he did not respond to any of the questions asked by either attorney; (2) Montiel appeared unkempt; and (3) on his jury questionnaire, he stated that he had "been convicted of a

---

**5.** *See Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

crime other than a traffic ticket" that was not a felony. Both counsel agreed that the prosecutor had struck some other non-minority venirepersons who had not said anything during voir dire. The prosecutor said he did not ask Montiel about his conviction to avoid embarrassing him. The trial court overruled the *Batson* objection because there was no evidence of any discriminatory motive in the prosecutor's decision to exercise a peremptory challenge against Montiel.

Defendant contends the trial court erred in overruling his *Batson* objection because the prosecutor had a discriminatory motive for using a peremptory challenge to remove the only racial minority from the panel. Defendant argues that the reasons given by the prosecutor for using a peremptory challenge against Montiel were pretextual, in that similarly situated venirepersons were not struck by the prosecutor. We disagree.

 In *Batson v. Kentucky*, 476 U.S. 79, 84, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court reaffirmed the principle that the use of peremptory challenges to remove a venireperson based upon his or her race is unconstitutional. *State v. Sutherland*, 939 S.W.2d 373, 378 (Mo. banc 1997). The following procedure should be used to assert a *Batson* challenge:

> First, the defendant must raise a *Batson* challenge with regard to one or more specific venirepersons struck by the state and identify the cognizable racial group to which the venireperson or persons belong. The trial court will then require the state to come forward with reasonably specific and clear race-neutral explanations for the strike. Assuming the prosecutor is able to articulate an acceptable reason for the strike, the defendant will then need to show that the state's proffered reasons for the

strikes were merely pretextual and that the strikes were racially motivated.

*State v. Bateman*, 318 S.W.3d 681, 689 (Mo. banc 2010). A trial court's determination of whether the State's use of a peremptory challenge resulted from a discriminatory motive is a finding of fact. *State v. Antwine*, 743 S.W.2d 51, 66 (Mo. banc 1987). Because this factual finding turns largely on the trial court's evaluation of credibility, an appellate court should give such a finding great deference. *Sutherland*, 939 S.W.2d at 380. The finding stands unless it is clearly erroneous, which requires this Court to "have a definite and firm conviction that a mistake has been made." *State v. Martin*, 291 S.W.3d 269, 277 (Mo.App.2009).

In the case at bar, defense counsel asserted a timely *Batson* objection to the prosecutor's use of a peremptory challenge against Hispanic venireperson Montiel. The prosecutor offered three specific and clear race-neutral reasons for the challenge: (1) Montiel's silence during the voir dire process; (2) his unkempt appearance; and (3) his prior criminal conviction. The trial court made a factual finding that none of these reasons were pretextual explanations hiding a discriminatory motive for the peremptory challenge. The court's finding is not clearly erroneous.

 First, a venireperson's silence can provide a valid, race-neutral reason for being peremptorily struck. *State v. Koenig*, 115 S.W.3d 408, 413 (Mo.App.2003); *State v. Hughes*, 944 S.W.2d 247, 248 (Mo. App.1997). "The state should not be required to take a risk on a prospective juror about whom little information is known." *State v. Barnett*, 980 S.W.2d 297, 302 (Mo. banc 1998). At trial, defense counsel conceded that the prosecutor had used peremptory challenges to remove other non-minority venirepersons who had been silent throughout voir dire. *See State v.*

*Ashley,* 940 S.W.2d 927, 931 (Mo.App.1997) (noting that the State also had used some of its peremptory challenges to remove Caucasian venirepersons who had remained silent throughout voir dire).

■ Second, the prosecutor stated that Montiel appeared unkempt. A venireperson's appearance can provide a valid, race-neutral reason for being peremptorily struck. *See, e.g., Purkett v. Elem,* 514 U.S. 765, 769, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (a juror's long, unkempt hair, mustache and beard provided a race-neutral, nondiscriminatory reason for the strike); *State v. Blankenship,* 830 S.W.2d 1, 15 (Mo. banc 1992) (noting that the venireperson's "appearance" was one of the nonpretextual, race-neutral explanations supporting the peremptory challenge); *State v. Washington,* 288 S.W.3d 312, 316–17 (Mo.App.2009) (holding that there was a race-neutral reason the State's use of a peremptory challenge against a venireperson who had a very individualistic hairstyle).

■ Third, a venireperson's prior criminal conviction can provide a valid, race-neutral reason for being peremptorily struck. *State v. Deck,* 994 S.W.2d 527, 537–38 (Mo. banc 1999) (holding that "a prior conviction is an appropriate and neutral basis for a peremptory strike"); *State v. Payne,* 958 S.W.2d 561, 565 (Mo.App. 1997).

Giving appropriate deference to the trial court's ability to judge the credibility of the prosecutor's reasons for peremptorily challenging venireperson Montiel, this Court is not left with a definite and firm conviction that a mistake has been made. Accordingly, the trial court did not err in overruling Defendant's *Batson* objection.

*See State v. Bateman,* 318 S.W.3d 681, 693 (Mo. banc 2010). Point I is denied.

### Point VII

■ Defendant's seventh point contends the trial court erred in admitting Ex. 6A, which is the photographic lineup that was shown to Victim on December 23, 2004. The following additional facts are relevant to this point.

Detective Southard testified that he prepared the photo lineup for Victim to view. This photo spread was comprised of pictures of six black males. Detective Southard obtained the photographs from Greene County. Nothing on the photographs disclosed their source or indicated why the pictures had been taken.[6] No one referred to the photographs as mug shots in the jury's presence. The photo array contained a picture of Defendant. During a conference held out of the presence of the jury concerning Ex. 6A, defense counsel stated: "Obviously the mug shots were from Greene County. We've already heard that. So the picture obviously is coming [from] Greene County. And I don't think that the jury may have caught that in any way. And so I didn't want to bring extra attention to it." Officer Thomas Rousset testified that he showed the photo lineup to Victim at the Ozark Police Department on December 23rd. Officer Rousset had not been involved in the robbery investigation and did not know Defendant was the person suspected of committing the crime. Officer Rousset told Victim not to assume that the suspect was in the lineup. He asked Victim to review the six photographs and see whether there was anyone in the lineup that Victim recognized. She identified Defendant's photograph.

---

**6.** Detective Southard first testified that he obtained the photographs from the Greene County Sheriff's Department, but he later stated that he had gotten the pictures from Greene County.

When Ex. 6A was offered, one of defense counsel's objections was that the exhibit was more prejudicial than probative because the individuals were shown in "mug shot" format, which revealed Defendant's potential past criminal history.[7] The trial court overruled the objection, and the exhibit was published to the jury. We review the trial court's ruling on the admission of evidence for abuse of discretion. *State v. Reed,* 282 S.W.3d 835, 837 (Mo. banc 2009). A trial court has broad discretion in deciding what evidence to admit. *Id.* An evidentiary ruling will not be disturbed on appeal unless it is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration. *State v. Holden,* 278 S.W.3d 674, 680 (Mo. banc 2009). Defendant contends the trial court erred in admitting Ex. 6A because this exhibit was more prejudicial than probative.

▪ First, Defendant argues that the exhibit was cumulative and unnecessary in light of Victim's in-court identification of Defendant. This was not the theory of Defendant's objection as asserted in the trial court. "A point on appeal must be based upon the theory voiced in the objection at trial and a defendant cannot expand or change on appeal the objection as made." *State v. Cannady,* 660 S.W.2d 33, 37 (Mo.App.1983). Because Defendant's first argument is based upon a different objection than the one made at trial, we decline to consider it. *State v. Goins,* 306 S.W.3d 639, 647 (Mo.App.2010).[8]

▪ Second, Defendant argues that trial testimony about the photos in the array coming from a police agency other than the Ozark Police Department necessarily communicated to the jury that Defendant had a prior arrest record. We find no merit in this argument. The jury was not presented with any evidence revealing that Defendant had any prior arrests or convictions. Detective Southard's testimony about where he got the pictures did include references to both the Greene County Sheriff's Department and Greene County. Defense counsel, however, later stated that he did not believe the jury understood the reference to the Sheriff's Department, and counsel did nothing to bring any extra attention to that testimony. Although the photographs in Ex. 6A were described as mug shots in arguments presented to the trial court, the pictures were never so described to the jury. Nothing on Ex. 6A disclosed the source of the pictures or why they were taken. "[T]he mere fact that a police department previously had on file a photograph of a defendant does not lead to the inference that the defendant has committed prior crimes." *State v. Tivis,* 933 S.W.2d 843, 846 (Mo.App.1996). "The admission of a mug shot constitutes prejudicial evidence

7. Defense counsel also asserted a foundational objection which has not been carried forward on appeal.

8. *Ex gratia* review reveals no error. At trial, defense counsel challenged Victim's identification of Defendant as the perpetrator of this crime. The fact that, during a photo lineup a few days after the incident, Victim identified Defendant as the robber corroborated her in-court identification of Defendant. Ex. 6A was logically relevant for that purpose because it tended to establish Defendant's guilt. *State v. Colvin,* 312 S.W.3d 436, 439 (Mo.App.2010).

It was legally relevant because the probative value of the exhibit as corroborative evidence outweighed any prejudicial effect. *Id.; see also State v. Harris,* 711 S.W.2d 881, 883 (Mo. banc 1986) (identifying witness may testify concerning his or her pretrial identification of suspect); *State v. Blaney,* 801 S.W.2d 447, 450 (Mo.App.1990) (evidence that a witness selected the defendant's picture from a photographic display was corroborative of her in-court identification of defendant) *abrogated on other grounds by State v. Withrow,* 8 S.W.3d 75, 79 n. 3 (Mo. banc 1999).

of other crimes only when the mug shots or accompanying testimony discloses a defendant's prior arrests or convictions." *Id.* at 847. The admission into evidence of a mug shot is permissible "where all identifying information is masked, where a defendant's identity is in issue and where admission of the mug shots will help a jury to determine the accuracy of the identification." *Id.* All of these requirements were satisfied in the case at bar. Consequently, the trial court did not abuse its discretion in admitting Ex. 6A. Point VII is denied.

### Point IV

Defendant's fourth point posits error in the trial court's decision to overrule Defendant's motion to exclude Croney's testimony based on an alleged *Brady* violation.[9] The following facts are relevant to this allegation of error.

In December 2004, Croney was Defendant's girlfriend. After Defendant was arrested, both he and Croney were charged with robbery. The prosecutor offered to drop the charges against Croney if she testified against Defendant.

This case was tried in March 9–10, 2009. During a bench conference on March 9th, defense counsel said he had been told there was a videotaped proffer from Croney that was made in connection with her plea deal. Counsel had requested disclosure of such information, and he argued that the nondisclosure created a potential *Brady* violation. The prosecutor agreed to provide a copy of the videotape to defense counsel.

When trial resumed on the 10th, the prosecutor reported that he was unable to find any proffer videotape concerning Croney. If such a tape ever existed, it would have been made during the 12 months prior to trial by Bob Alexander, an investigator for the prosecutor's office. The usual procedure was to record a proffer statement, place it in the file, make a docket entry in the file noting that a proffer had been obtained and send a copy to defense counsel. No videotape was found in the criminal files of Defendant or Croney or anywhere else in the offices of the prosecutor or investigator Alexander. Neither criminal file contained any docket entries reflecting that a proffer statement had been obtained from Croney. Defense counsel had not received a copy of the videotape. The prosecutor had never reviewed any such videotape, and he did not know whether one existed. Defense counsel renewed his *Brady* motion and asked that Croney not be allowed to testify because the videotape might have contained exculpatory or impeaching material. The judge took the motion under advisement and permitted defense counsel to interview Alexander and Croney. Later that day, the court conducted another hearing on this issue out of the presence of the jury. Alexander and Croney were called as witnesses.

Alexander testified that he worked as an investigator for the prosecutor. The general procedure for a proffer was to videotape the statement in a question-and-answer format with the witness under oath. Alexander remembered taking a proffer from Croney. He failed to note the existence of the proffer on the file. The statement was no more than 10 minutes long. Alexander took no notes of what Croney said. He usually stored the original proffer videotape in his office and put a copy in the file. Alexander had searched for the videotape and was unable to find it. The videotape was lost. He recalled that, during the proffer, Croney said Defendant had intended to commit a robbery when they went to Wal–Mart. She did not see

---

**9.** *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

the robbery. Defendant told her where to park the car. He left, came back and told her where to go from there.

Croney testified that she remembered giving a recorded proffer statement the year before trial. She told Alexander what happened the night of the robbery. Croney told Alexander that Defendant wanted to "hit a lick" at Wal–Mart. He got out of the car and came back with a purse.

The court found that it was likely a proffer statement had been taken from Croney. The motion to exclude Croney's testimony was denied. The court decided there was no evidence that the videotaped proffer statement contained any exculpatory or impeaching material. As the court noted, "the purpose of the proffer was to provide incriminating evidence." The court also found that defense counsel would be able to cross-examine Croney and impeach her testimony using other witnesses.

Croney was called as a witness by the State. On direct examination, she testified that she and Defendant have a child together and were in a relationship when the robbery occurred. Croney admitted that she had reached an agreement with the prosecutor to have the charge against her dropped if she testified truthfully against Defendant. She and Defendant drove to Wal–Mart in the Cavalier. They went there because Defendant wanted to "hit a lick" by getting some money. She parked the car in the Wal–Mart parking lot, and Defendant left the vehicle. Defendant got back in the car with a purse. They used an EBT card (which had the PIN with it) from the purse to buy groceries and then went back to the house in Ozark where they had been staying. When officers arrived and asked about the robbery, Croney said she had not been at Wal–Mart and knew nothing about the robbery. She ad-

mitted this story had been a lie. Croney also admitted to telling a different lie to an attorney representing Defendant in a civil case in order to get his bond money. She admitted having a prior conviction for passing bad checks. On cross-examination, Croney again admitted that she had lied repeatedly to police during the investigation. Croney acknowledged that she had been charged with a class A felony of robbery along with Defendant. She had not implicated Defendant until she was offered a plea deal that would result in the complete dismissal of the charge against her. Croney agreed that she did not remember a lot of the details of the event because it had happened five years earlier.

Defendant contends the trial court erred in denying his motion to exclude Croney's trial testimony based upon *Brady*. Defendant argues that exclusion of Croney's testimony was a proper sanction for this *Brady* violation because the videotape potentially contained exculpatory or impeaching evidence. We disagree.

**■** *Brady* holds that due process is violated when the State suppresses evidence that is favorable to the defendant and material to either guilt or punishment. *State v. Salter*, 250 S.W.3d 705, 714 (Mo. banc 2008). "Evidence is material only when there is a reasonable probability that the result of the proceeding would have been different if the evidence had been disclosed to the defense." *Id.* A true *Brady* violation occurs only if: (1) the evidence at issue was favorable to the accused, either because it was exculpatory or because it was impeaching; (2) the State must have willfully or inadvertently suppressed the evidence; and (3) prejudice must have ensued. *Taylor v. State*, 262 S.W.3d 231, 240 (Mo. banc 2008). Although the trial court found that the State lost Croney's videotaped proffer statement, Defendant failed

to prove the first and third components necessary for a *Brady* violation.

■ After hearing the testimony of Alexander and Croney, the trial court decided there was no evidence that the proffer statement contained any exculpatory or impeaching material. That finding is supported by the record. The proffer statement was short. Its purpose was to provide inculpatory evidence against Defendant, and the statement appears to have done so. During the proffer, Alexander heard Croney say that Defendant intended to commit a robbery when they went to Wal–Mart. Croney testified that she told Alexander that Defendant wanted to "hit a lick" at Wal–Mart. He got out of the car and came back with a purse. Nothing about these statements is exculpatory or useful to impeach Croney's trial testimony. Defendant produced no evidence of any other statements by Croney that could be used for either of those purposes. Therefore, Defendant failed to prove that the lost videotape was favorable to him because it contained exculpatory or impeaching evidence. *State v. Martin*, 291 S.W.3d 269, 289–90 (Mo.App. 2009).

■ Defendant also failed to show how any prejudice ensued from the loss of the videotape. Croney did not actually witness the robbery, and nearly all of her testimony was cumulative of other evidence presented by the State. Croney's credibility was vigorously challenged by defense counsel using information already at his disposal. Counsel was able to show that Croney initially denied involvement in the robbery and did not implicate Defendant until four years later when she was offered a plea deal. Croney admitted on direct and cross-examination that she had repeatedly lied to police during the investigation. She acknowledged a prior conviction for passing bad checks, which the

jurors could consider in assessing her believability. Finally, she agreed that she did not remember a lot of the details of the event because it had happened five years earlier. The lost videotape was immaterial because there is no reasonable probability that the outcome of the trial would have been different if this evidence had been disclosed to the defense. *State v. Ferguson*, 20 S.W.3d 485, 504 (Mo. banc 2000). Point IV is denied.

### Point VI

■ Defendant's sixth point contends the trial court erred in excluding testimony from an expert witness concerning the fallibility of eyewitness identification testimony. The following additional facts are relevant to this point.

Prior to trial, defense counsel disclosed his intention to call an expert witness to testify about human memory and factors that affect the reliability of identification. The prosecutor filed a motion in limine to exclude the testimony because it invaded the province of the jury. The trial court sustained the motion.

At the beginning of the trial, the court read Instruction No. 1 (pattern instruction MAI–CR 3d 302.01) to the jury. This instruction advised the jurors that it was up to them to decide the believability of the witnesses and the weight and value of the evidence. The instruction also stated:

In determining the believability of a witness and the weight to be given to testimony of the witness, you may take into consideration the witness' manner while testifying; the ability and opportunity of the witness to observe and remember any matter about which testimony is given; any interest, bias, or prejudice the witness may have; the reasonableness of the witness' testimony considered in the light of all of the evidence in

the case; and any other matter that has a tendency in reason to prove or disprove the truthfulness of the testimony of the witness.

During opening statement, defense counsel told the jurors that they would hear evidence that: (1) Victim described the person who robbed her only as a short, black male; (2) she was shocked when the robbery occurred; and (3) the encounter did not take much time. From these and other facts, defense counsel suggested that jurors would conclude Defendant did not commit the crime of which he was accused.

After the State rested, the trial court allowed defense counsel to call Dr. John Gambon as an expert witness in order to make an offer of proof. Dr. Gambon was a psychology professor who had conducted classroom experiments with his students to demonstrate the fallibility of memory. Dr. Gambon testified that memories can be influenced by a person's attitudes and concepts about other persons, and that individuals lose memories over time. According to Dr. Gambon, many things go wrong with a person's memory when a crime is committed. A witness believes what he or she is saying is correct, but the person's level of stress can affect his or her ability to pick up on details. When a weapon is involved, a person tends to focus on the weapon and not pay attention to the facial features, height, weight and build of an assailant. A person often believes a memory is accurate when the event was never actually committed to memory in the first place. Delay in recalling a memory can affect the accuracy of one's recollection. Dr. Gambon had watched the surveillance video of Victim's robbery and gave the following testimony concerning the incident:

> [I]n watching the video one of things that happened was that the—the whole sequence of events where when logic

finally boiled down to the individual approaching the victim, seemed like it happened in all of a span of just a few seconds. It started and it finished and it was over. The shorter amount of exposure time the less time you tend to have paying attention to detail. And so being able to accurately say that, you know, this is the person, yes or no, is one thing. Another aspect is—is the time of day. It was nighttime. And once again, at night we find our [ability] to pick up on detail is not as good as it is during the daytime in the better lit situation. Also, if there is, as I said earlier, a weapon involved. We have what's called weapons focus. People tend to focus on the weapon that is being displayed. They don't know what's about to happen. This is happening so fast, all right, that basically looking at the facial features, uh, hair, the color of the eyes, and so on, it's not something that we tend to tell ourselves to do. There is just so much information hitting you so fast. It's amazing that we can pick up on the important details and store them into memory at all.

According to Dr. Gambon, there had been research findings implying that cross-cultural identification was a little bit less accurate. Dr. Gambon opined that someone's ability to accurately identify a perpetrator could be affected by factors present in this particular case, such as cultural issues, a short encounter and a weapon focus. After listening to the offer of proof, the trial court excluded Dr. Gambon's testimony.

In closing argument, defense counsel challenged Victim's identification of Defendant as the robber. Defense counsel argued that Victim was not really sure what she had seen and heard. Counsel asserted that the description of the robber Victim gave to police was vague and lacking in

detail. He suggested that Victim's testimony identifying Defendant was not believable.

On appeal, Defendant contends the trial court's decision to exclude Dr. Gambon's testimony was erroneous because the proffered evidence concerned a topic beyond the common knowledge of a lay person and would have been beneficial to the jury. We disagree.

The admission or exclusion of expert testimony is a matter committed to the trial court's sound discretion. *State v. Davis*, 814 S.W.2d 593, 603 (Mo. banc 1991). This discretion is abused only when the trial court's ruling is arbitrary, unreasonable or clearly against the logic of the circumstances. *State v. Wright*, 247 S.W.3d 161, 165 (Mo.App.2008). Based upon this Court's review of the offer of proof, it is clear that the sole purpose of Dr. Gambon's testimony was to cast doubt on the credibility of Victim's identification of Defendant as the robber. The trial court did not believe the admission of such testimony would aid the jury. In *State v. Whitmill*, 780 S.W.2d 45, 47 (Mo. banc 1989), the defendant tried to present expert testimony concerning the reliability of eyewitness identification. The testimony was excluded, and our Supreme Court affirmed that ruling:

> Generally, expert testimony is inadmissible if it relates to the credibility of witnesses because this constitutes an invasion of the province of the jury. *Lawhorn*, 762 S.W.2d at 823; *State v. Taylor*, 663 S.W.2d 235 (Mo. banc 1984). In *Lawhorn* this Court held that a trial court may, in its discretion, exclude expert testimony regarding the credibility of eyewitness identifications. The defendant in that case would have offered expert testimony as to alleged difficulties of cross-racial identifications. This Court stated, "[S]uch matters are within the general realm of common experience of members of a jury and can be evaluated without an expert's assistance.... The fact that in many instances identifications may be unreliable and that the state's case and the subsequent determination of guilt or innocence may depend on the credibility of eyewitness identifications, does not leave a criminal defendant without protection if the trial court, in its discretion, denies the admissibility of expert testimony in this regard." *Lawhorn*, 762 S.W.2d at 823.

> In Whitmill's trial several safeguards ensured that the defendant had an adequate opportunity to apprise the jury of the difficulties inherent in an eyewitness identification. The defendant fully cross-examined both Nivey and Theordis Mitchell, who identified the photograph of Whitmill as the man who shot them. Whitmill also had an opportunity to speak to the jury about the problem of identification in the opening statement and in the closing argument; and the court instructed the jury on the factors it should consider in determining whether the identification was reliable. MAI–CR 3d 302.01. Thus, the *Lawhorn* protections, mentioned above, were present; and the trial court did not abuse its discretion in refusing to permit Professor Goldstein's testimony.

*Whitmill*, 780 S.W.2d at 47. All of the trial safeguards mentioned in *Whitmill* were available to, and utilized by, defense counsel during Defendant's trial. Victim was thoroughly cross-examined concerning her identification of Defendant as the man who committed the robbery. The reliability of Victim's identification was challenged by defense counsel in opening statement and closing argument. Instruction No. 1, which was patterned after MAI–CR 3d 302.01, was read to the jurors and described the various factors they should

consider in determining the credibility of Victim's testimony. The exclusion of Dr. Gambon's testimony was not an abuse of discretion. *See, e.g., State v. Lawhorn,* 762 S.W.2d 820, 822–23 (Mo. banc 1988) (affirming the exclusion of expert testimony that witnesses have difficulty identifying suspects of other races); *Wright,* 247 S.W.3d at 165–66 (affirming the exclusion of expert testimony concerning personality traits which make it more likely for a person to give a false confession); *State v. Davis,* 32 S.W.3d 603, 607–09 (Mo.App. 2000) (affirming the exclusion of expert testimony on interrogation techniques, false confessions and coercive persuasion); *State v. Biezer,* 947 S.W.2d 540, 541–43 (Mo.App.1997) (affirming the exclusion of expert testimony offered to challenge a police officer's interview techniques); *State v. Edwards,* 918 S.W.2d 841, 845–46 (Mo. App.1996) (affirming the exclusion of expert testimony that a child sex-abuse victim did not know the difference between truth and fantasy); *State v. Donnell,* 862 S.W.2d 445, 450 (Mo.App.1993) (affirming the exclusion of expert testimony on the reliability of cross-racial identification and psychological factors affecting eyewitness identification) *abrogated on other grounds by State v. Williams,* 936 S.W.2d 828, 831–32 (Mo.App.1996). Point VI is denied.

### Point V

■ Defendant's fifth point concerns alleged instructional error. The following additional facts are relevant to this point.

Instruction No. 6, which was based upon MAI–CR 3d 323.02, was the verdict-directing instruction for the first-degree robbery count. Instruction No. 8, which was based upon MAI–CR 3d 332.02, was the verdict-directing instruction for the armed criminal action count. Each instruction hypothesized that Defendant was the person who committed the specified offense. Defense counsel objected to each instruction as not being supported by the evidence. The court overruled these objections and gave the instructions.

■ On appeal, Defendant contends Instruction No. 6 and Instruction No. 8 should not have been given because they are not supported by the evidence. "A jury instruction must be supported by substantial evidence and the reasonable inferences to be drawn therefrom." *State v. Avery,* 275 S.W.3d 231, 233 (Mo. banc 2009). Appellate review is limited to determining whether sufficient evidence was admitted at trial from which a reasonable trier of fact could have found each element of the offense to have been established beyond a reasonable doubt. *State v. Brown,* 246 S.W.3d 519, 531 (Mo.App. 2008). We view the evidence and inferences in the light most favorable to the State, which was the party tendering the instruction. *State v. Hartman,* 224 S.W.3d 642, 648 (Mo.App.2007). All contrary evidence and inferences are disregarded. *Id.*

■ Defendant argues that he is entitled to a new trial because all of the evidence against him was circumstantial and unclear as to whether he was the individual who committed the offense. He asserts that: (1) Victim's physical description of her assailant was vague; (2) during the brief encounter, she only focused on his eyes; (3) no physical evidence linked Defendant to the crime; and (4) Croney's testimony, which was given in exchange for a complete dismissal of the charge against her, lacked credibility. All of these assertions ask this Court to reweigh the evidence, decide witness credibility and resolve conflicts in the evidence. This we cannot do. An appellate court only determines whether an instruction is supported by sufficient evidence; it is not our role to reweigh the evidence. *Brown,* 246 S.W.3d at 531. It was up to the jury to decide the

credibility of the evidence presented. *State v. Avery,* 120 S.W.3d 196, 203–06 (Mo. banc 2003); *State v. Deckard,* 18 S.W.3d 495, 497 (Mo.App.2000). At trial, Victim positively identified Defendant as the person who robbed her while wielding a knife. Victim's eyewitness testimony alone, which the jury was entitled to believe, is sufficient to support Defendant's conviction for first-degree robbery and armed criminal action. *State v. Williamson,* 836 S.W.2d 490, 495–96 (Mo.App. 1992); *State v. Barnes,* 693 S.W.2d 331, 332 (Mo.App.1985). Point V is denied.

The judgment of the trial court is affirmed.

BARNEY, J. and BURRELL, J., Concur.